Case No. 23-2738

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

JANE DOE, on behalf of herself and those similarly situated,

*Plaintiff/Appellee,*

v.

CENTERVILLE CLINICS, INC.,

*Defendant/Appellant.*

On Appeal from the United States District Court
For the Western District of Pennsylvania
Case No. 2:23-cv-01107

---

## APPELLANT CENTERVILLE CLINICS, INC.'S BRIEF

---

FELDESMAN LEIFER LLP
Matthew Sidney Freedus
Rosie Dawn Griffin
Khatereh S. Ghiladi
1129 20th Street, N.W., Suite 400
Washington, DC 20036
Tel: 202.466.8960
Fax: 202.293.8103

*Counsel for Appellant Centerville Clinics, Inc.*

## Corporate Disclosure Statement

Pursuant to Fed. Rule App. P. 26.1 and Third Circuit LAR 26.1, undersigned counsel for Appellant Centerville Clinics Inc. makes the following disclosure: Centerville Clinics Inc. has no parent corporation and no stock, publicly held or otherwise.

DATED: January 16, 2024

*s/ Matthew Sidney Freedus*
FELDESMAN LEIFER LLP
Matthew Sidney Freedus
1129 20th Street NW, 4th Floor
Washington, DC 20036
Tel: 202.466.8960
Fax: 202.293.8103
mfreedus@ftlf.com

*Counsel for Appellant*

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................... ii

JURISDICTIONAL STATEMENT .............................................................................1

STATEMENT OF THE ISSUES PRESENTED .........................................................2

STATEMENT OF RELATED CASES AND PROCEEDINGS ..................................3

PERTINENT STATUTES............................................................................................3

STATEMENT OF THE CASE .....................................................................................3

    I.  Legal Framework ...............................................................................................3

        A. 42 U.S.C. § 233 Immunity and Removal Jurisdiction ..................................3

        B. 28 U.S.C. § 1442(a)(1) Removal ..................................................................7

    II. Factual Background and Proceedings Below.....................................................9

STANDARD OF REVIEW.........................................................................................16

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................................16

ARGUMENT ..............................................................................................................19

I.  Removal was Substantively and Procedurally Proper Under 42 U.S.C. § 233.....19

    A. 42 U.S.C. § 233(*l*)(2) Must Be Broadly Construed In Favor Of A Federal Forum And With A Presumption Of Judicial Review .....................................20

    B. The Plain Text of § 233(*l*) Confers Removal jurisdiction Here.......................24

    C. The Unmistakable Thrust and Purpose of § 233(*l*)(2) Support Removal Jurisdiction Here...............................................................................................30

II.  As a Deemed Public Health Service Employee, Centerville Properly Removed This Matter Under 28 U.S.C. § 1442(a)(1)...........................................34

A. Centerville Is A Federal Officer Sued for or Relating to Acts Under Color of Office Within the Meaning of 28 U.S.C. § 1442.........................................36

1.  Centerville is a Federal Officer ...................................................................36

2.  Centerville Was Sued for or Related to Acts Under Color of Office .........40

B. Centerville Was, At The Very Least, Acting Under a Federal Officer Within the Meaning of 28 U.S.C. § 1442 .......................................................42

CONCLUSION.........................................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Laboratories v. Gardner*,
   387 U.S. 136 (1967) ........................................................................22

*Agyin v. Razmzan*,
   986 F.3d 168 (2d Cir. 2021) ....................................................*passim*

*Allen v. Christenberry*,
   327 F.3d 1290 (11th Cir. 2003)...................................................21, 31

*Arizona v. Manypenny*,
   451 U.S. 232 (1981) ........................................................................39

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .......................................................................16

*Estate of Booker v. Greater Phila. Health Action, Inc.*,
   10 F.Supp.3d 656 (E.D. Pa. 2014)....................................................7

*Booker v. United States*,
   No. 13-cv-1099, 2015 WL 3884813 (E.D. Pa. June 24, 2015) ...................19, 20

*Bowen v. Michigan Academy of Family Physicians*,
   476 U.S. 667 (1986) .........................................................................2

*Estate of Campbell v. S. Jersey Med. Ctr.*,
   732 Fed. Appx. 113 (3d Cir. 2018) ...........................................*passim*

*Caver v. Cent. Ala. Elec. Coop.*,
   845 F.3d 1135 (11th Cir. 2017)......................................................45

*Celestine v. Mount Vernon Neighborhood Health Ctr.*,
   403 F.3d 76 (2d Cir. 2005) ........................................................30, 31

*Colorado v. Symes*,
   286 U.S. 510 (1932) ...............................................................8, 38, 42

*Commonwealth of Pennsylvania v. Newcomer*,
   618 F.2d 246 (3d Cir. 1980).............................................................41

*In re Commonwealth's Motion to Appoint Counsel Against or Directed*
   *to Def. Ass'n of Phila.*,
   790 F.3d 457 (3d Cir. 2015) ........................................................*passim*

*Demers v. Buonanno*,
   No. 12-cv-676, 2012 WL 5930223 (D.R.I. Nov. 2, 2012) .................................. 39

*Doe v. Redeemer Health*,
   No. 23-cv-2405, 2023 WL 6323089 (E.D. Pa. Sept. 28, 2023) .......................... 44

*Ford v. Sandhills Med. Found., Inc.*,
   No. 21-cv-02307, 2022 WL 1810614 (D.S.C. June 2, 2022) .............................. 35

*Friedenberg v. Lane County*,
   68 F.4th 1113 (9th Cir. 2023) ..............................................5, 9, 29, 42

*Gabriel v. Alger*,
   No. 14-cv-03022, 2015 WL 1042507 (D. Colo. Mar. 5, 2015) .......................... 39

*Gutierrez de Martinez v. Lamagno*,
   515 U.S. 417 (1995) ................................................................18, 22, 23, 24

*Hui v. Castaneda*,
   559 U.S. 799 (2010) ..........................................................................2, 3, 24, 29

*Isaacson v. Dow Chem. Co.*,
   517 F.3d 129 (2d Cir. 2008) ................................................................ 44

*Jefferson County v. Acker*,
   527 U.S. 423 (1999) ..........................................................................8, 38, 44

*In re Joliet-Will Cnty. Cmty. Action Agency*,
   847 F.2d 430 (7th Cir. 1988) ................................................................ 45

*Kidder v. Richmond Area Health Ctr.*,
   595 F. Supp. 2d 139 (D. Me. 2009) ...................................................... 39

*Maglioli v. All. HC Holdings LLC*,
   16 F.4th 393 (3d Cir. 2021) ............................................................16, 47

*Maryland v. Soper*
   270 U.S. 9 (1926) ..........................................................................40, 41

*McLaurin v. United States*,
  392 F.3d 774 (5th Cir. 2004) ................................................................ 6

*Mesa v. California*,
  489 U.S. 121 (1989) ..................................................................... 7, 43

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985) ..................................................................... 2, 16

*Nichols v. Sabzwari*,
  No. 17-cv-01621, 2017 WL 6389634 (D.S.C. Nov. 13, 2017) ........................... 9

*Nye v. Hilo Med. Ctr.*,
  No. 09-cv-220, 2010 WL 931926 (D. Haw. Mar. 11, 2010) ............................ 34

*Osborn v. Haley*,
  549 U.S. 225 (2007) ....................................................................... 39

*Oviedo v. Hallbauer*,
  655 F.3d 419 (5th Cir. 2011) ............................................................... 9

*Papp v. Fore-Kast Sales Co.*,
  842 F.3d 805 (3d Cir. 2016) ................................................... 16, 41, 43

*Rosenblatt v. St. John's Episcopal Hosp.*,
  No. 11-cv-1106, 2012 WL 294518 (E.D.N.Y. 2012) .................................... 39

*Sekhar v. United States*,
  570 U.S. 729 (2013) ....................................................................... 36

*Sun Buick, Inc. v. Saab Cars USA, Inc.*,
  26 F.3d 1259 (3d Cir. 1994) ................................................................. 8

*Tennessee v. Davis*,
  100 U.S. 257 (1880) ................................................................... 38, 43

*Watson v. Philip Morris Cos.*,
  551 U.S. 142 (2007) ................................................................. *passim*

*Williams v. Brantley*,
  492 F. Supp. 925 (W.D.N.Y. 1980) ................................................. 39, 40

*Willingham v. Morgan*,
  395 U.S. 402 (1969) ................................................................. *passim*

*Young v. Temple Univ. Hosp.*,
No. 18-cv-2803, 2019 WL 109388 (E.D. Pa. Jan. 3, 2019) .............................21

**Statutes**

Emergency Health Personnel Act of 1970, Pub. L. No. 91-623, 84 Stat.
1870–71 (1970)...........................................................................................46

Federally Supported Health Centers Assistance Act of 1992, Pub. L. No.
102-501, 106 Stat 3268 (1992)...................................................................31, 32

Federally Supported Health Centers Assistance Act of 1995, Pub L. No.
104-73, 109 Stat 777 (1995)........................................................................6, 32

Special Health Revenue Sharing Act, Pub. L. No. 94-63, 89 Stat 342
(1975).............................................................................................................4

1 U.S.C. § 1.....................................................................................................43

28 U.S.C. § 2679......................................................................................*passim*

28 U.S.C. § 1291..............................................................................................2

28 U.S.C. § 1346(b)(1) ...................................................................................33

28 U.S.C. § 1441..............................................................................20, 21, 39

28 U.S.C. § 1442......................................................................................*passim*

28 U.S.C. § 1447................................................................................................2

42 U.S.C. § 233.........................................................................................*passim*

42 U.S.C. § 233(a) ....................................................................................*passim*

42 U.S.C. § 233(b) .......................................................................................6, 13

42 U.S.C. § 233(c) ....................................................................................*passim*

42 U.S.C. § 233(g) ....................................................................................*passim*

42 U.S.C. § 233(h)(l).........................................................................................5

42 U.S.C. § 233(*l*)(1) ................................................................................*passim*

42 U.S.C. § 233(*l*)(2) ..................................................*passim*

42 U.S.C. § 254b..................................................*passim*

42 U.S.C. § 254b(a) ..................................................9, 11

42 U.S.C. § 254b(b)(1) ..................................................10, 41, 48

42 U.S.C. § 254b(k)(3)(C) ..................................................12, 41, 48

42 U.S.C. § 254b(k)(3)(G) ..................................................9, 11, 48

42 U.S.C. § 254b(o)..................................................45

42 U.S.C. § 1395oo..................................................24

## Regulations

42 C.F.R. § 51c.102(c)(1) ..................................................48

42 C.F.R. § 51c.112 ..................................................49

45 C.F.R. § 2.1(a) ..................................................40

45 C.F.R. § 2.2(4) ..................................................40

## Legislative Materials

Federally Assisted Health Clinics Legal Protection Act of 1991: Hearing on H.R. 2239 Before H. Subcomm. On Administrative Law and Governmental Relations of the Comm. on the Judiciary, 102d Cong. 17 (July 17, 1991) ..................................................32

H.R. Rep. No. 80-308 (1947) ..................................................38

H.R. Rep. No. 102-823(I) (1992) ..................................................41, 46, 47

H.R. Rep. No. 104-398 (1995) ..................................................31, 46, 51

S. Rep. No. 94-29 (1975)..................................................4, 50

S. Rep. No. 107-83 (2001)..................................................4, 50

**Other Authorities**

Bureau of Primary Health Care, Determination of Coverage for COVID-
  19-Related Activity by Health Center Providers under 42 U.S.C. §
  233(g)(1)(B) and (C),
  https://bphc.hrsa.gov/sites/default/files/bphc/ftca/pdf/COVID19Gene
  ralDeterminationHC.pdf ................................................................................. 50

Determination That an Individual Shall Not Be Deemed an Employee of
  the Public Health Service, 80 Fed. Reg. 12104-01, 2015 WL 930605
  (Mar. 6, 2015) .............................................................................................. 6

HHS, Health Resources and Services Administration, *Health Center
  Program Compliance Manual*, Ch. 3: Needs Assessment (2018),
  https://bphc.hrsa.gov/compliance/compliance-manual/chapter3 ....................... 12

HHS, Health Resources and Services Administration, Program
  Assistance Letter 2021-01, Application for Health Center Program
  Award Recipients for Deemed Public Health Service Employment
  with Liability Protections Under the Federal Tort Claims,
  https://bphc.hrsa.gov/sites/default/files/bphc/compliance/pal-2021-
  01_0.pdf ............................................................................................. 5, 6, 12, 13

HRSA, NHSC, *NHSC Timeline*, https://nhsc.hrsa.gov/about-us/timeline- ............. 46

*Office, Black's Law Dictionary* (11th Ed. 2019) ..................................................... 36

*Officer, Ballentine's Law Dictionary* 881 (3d Ed. 1969) ........................................ 36

*Officer, Black's Law Dictionary* (11th Ed. 2019) .................................................. 36

# JURISDICTIONAL STATEMENT

The United States District Court for the Western District of Pennsylvania had jurisdiction over this action under 28 U.S.C. § 1442 and 42 U.S.C. § 233(*l*)(2). The former statute provides a right of removal to any federal officer "or any person acting under that officer" where the action is "for or relating to any act under color of such office." 28 U.S.C. § 1442; *see Agyin v. Razmzan*, 986 F.3d 168, 174 (2d Cir. 2021) (concluding "removal under § 1442 was proper because. . . [deemed physician] was acting under a federal officer" when providing services in keeping with his health center employment agreement). The latter provides a removal right to any "entity or officer, governing board member, employee, or contractor of the entity" who has been deemed to be a Public Health Service ("PHS") employee for purposes of § 233 immunity. 42 U.S.C. § 233(*l*)(2); *see also Estate of Campbell v. S. Jersey Med. Ctr.*, 732 Fed. Appx. 113, 116–17 (3d Cir. 2018) (concluding § 233(*l*)(2) "grants a district court jurisdiction to decide whether to remand the case or to substitute the United States as a party and deem the action as one brought under the FTCA").

On September 20, 2023, Centerville timely noticed this appeal from the district court's remand order—issued that same day—denying Centerville's right to absolute immunity and remanding the case to the state court from which it was removed. A1–2, 3–8.[1]

---

[1] Citations to the Appendix appear as "A" followed by the relevant page number(s)

This Court has jurisdiction under 28 U.S.C. § 1291. *See Hui v. Castaneda*, 559 U.S. 799, 804 n.4 (2010) (district court orders denying absolute immunity [under § 233(a)] constitute "final decisions" for purposes of 28 U.S.C. § 1291) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 524–27 (1985)). The Court also has jurisdiction under 28 U.S.C. § 1447, which provides that "an order remanding a case to the State court from which it was removed pursuant to section 1442 . . . of this title shall be reviewable by appeal or otherwise." 28 U.S.C. § 1447(d); *see also BP P.L.C. v. Mayor and City Council of Baltimore*, 141 S. Ct. 1532, 1538 (2021) (holding when court remands case removed pursuant to § 1442 and other grounds, all grounds are reviewable on appeal).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Whether a defendant deemed by the United States Department of Health and Human Services to be a federal Public Health Service employee may properly remove a case against it to district court pursuant to 42 U.S.C. § 233(*l*)(2) where the United States Attorney General timely appeared in the state court but failed to advise that court as to "whether the [HHS] Secretary has determined . . . that such entity . . . is deemed to be an employee of the Public Health Service for purposes of this section with respect to the actions or omissions that are the subject of such civil action or proceeding" as required by 42 U.S.C. § 233(*l*)(1).

2.      Whether, as a separate or alternative basis for removal jurisdiction, a

---

throughout.

deemed PHS defendant is entitled, as a federal officer or person acting under a federal officer, to remove a case against it to district court pursuant to 28 U.S.C. § 1442.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before the Court previously. Aside from the underlying state court matter, undesigned counsel is not aware of any other related case or proceeding pending before any other federal or state court or administrative agency.

## PERTINENT STATUTES

The federal officer removal statute, 28 U.S.C. § 1442, and pertinent portions 42 U.S.C. §§ 233 and 254b, are reprinted in the addendum to this brief.

## STATEMENT OF THE CASE

### I.    Legal Framework

### A.    42 U.S.C. § 233 Immunity and Removal Jurisdiction

The Emergency Health Personnel Act of 1970, *codified at* 42 U.S.C. § 233(a) *et seq*., immunizes PHS employees from civil actions resulting from "medical, surgical, dental, or related functions" undertaken within the scope of official employment. 42 U.S.C. § 233(a). PHS employees' suit immunity—a freedom from the burdens of both litigation and liability—is ensured by 42 U.S.C. § 233(a), which makes a suit against the United States under the Federal Tort Claims Act ("FTCA") "exclusive of any other civil action or proceeding." *Id*. The immunity is "comprehensive," covering "both known and unknown causes of action." *Hui*, 559 at 806, 810 (holding § 233(a)

3

immunity extends to *Bivens* actions against PHS employees).

In 1975, five years after enacting 42 U.S.C. § 233(a), Congress—via Section 501 of the Special Health Revenue Sharing Act—authorized the appropriation of significant funds to nonprofit, community-based safety-net healthcare providers. Pub. L. No. 94-63, 89 Stat. 342–46 (adding Section 330 to the PHS Act, *codified at* 42 U.S.C. § 254b). The Act reflects Congress's commitment to the "national objective" of providing "high quality health services to all American communities." S. Rep. No. 94-29, at 119 (1975), *reprinted in* 1975 U.S.C.C.A.N. 469, 581. The health center program has enjoyed longstanding bipartisan support since its inception. *See, e.g.,* S. Rep. No. 107-83 at 2 (2001), *reprinted in* 2001 U.S.C.C.A.N. 1033, 1034 (noting "critical" need for "committee to act to reauthorize and improve programs [including the Health Centers program] that make it possible for millions of Americans to access a health care safety net").

The Federally Supported Health Centers Assistance Act ("FSHCAA") of 1992 (as amended in 1995), *codified at* 42 U.S.C. § 233(g)–(n), authorizes the HHS Secretary to extend to § 254b health center grantees and their officers, directors, and employees the same absolute immunity § 233(a) affords actual PHS employees. 42 U.S.C. § 233(g)(1)(A) (extending "the same" immunity to deemed PHS employees); *Agyin*, 986 F.3d at 177 (holding deemed PHS employee "received from the federal government a delegation of the same legal immunity . . . extended to employees of the

4

Public Health Service"); *Friedenberg v. Lane County*, 68 F.4th 1113, 1126 (9th Cir. 2023).

To be deemed a PHS employee for purposes of § 233(a) immunity, the FSHCAA requires an application with detailed information and supporting documentation sufficient for HHS to verify the health center applicant has, among other things, "implemented appropriate policies and procedures to reduce the risk of malpractice and the risk of lawsuits arising out of any health or health-related functions performed by the entity." 42 U.S.C. § 233(h)(l). For example, as relevant here, the HHS-prescribed application requires the applicant's assurance that it will "implement and maintain systems and procedures for protecting the confidentiality of patient information and safeguarding this information against loss, destruction, or unauthorized use, consistent with federal and state requirements." *See* HHS, Health Resources and Services Administration, Program Assistance Letter ("PAL") 2021-01, Application for Health Center Program Award Recipients for Deemed Public Health Service Employment with Liability Protections Under the Federal Tort Claims Act at 16, https://bphc.hrsa.gov/sites/default/files/bphc/compliance/pal-2021-01_0.pdf.

The HHS Secretary must make a deeming determination within 30 days of receipt of a health center's application. 42 U.S.C. § 233(g)(1)(E). Because deemed status is provided for a specified, prospective period (like an occurrence-based insurance policy), a health center defendant's status in any past period is readily

5

ascertainable, reflected in an HHS Notice of Deeming Action as to any calendar year. PAL 2021-01, at 2.[2] The statutory authority to make the deeming determination under § 233(g) and (h) is vested exclusively in the Secretary. 42 U.S.C. § 233(g)(1)(F).

A favorable deeming determination is "final and binding" on HHS, the Attorney General, and any party to any civil action or proceeding, with one exception not relevant here. *Id.* § 233(g)(1)(D)–(F), (i) (providing physician's deemed status may be revoked if she "would expose the Government to an unreasonably high degree of risk of loss").[3] When an action is brought against a deemed health center in state court, the deemed defendant must deliver "all process served upon him or an attested true copy thereof to his immediate superior or to whoever was designated by the Secretary to receive such papers." *Id.* § 233(b). *McLaurin v. United States*, 392 F.3d 774, 779 (5th Cir. 2004) ("It is the *supervisor* [in this case, the assigned division of OGC], not the *employee*, who must 'promptly' deliver the suit papers to the government.").

Within fifteen days of notice of the lawsuit, the Attorney General must appear in the state court and advise that court "as to whether *the Secretary* has determined *under subsections (g) and (h)* of [Section 233], that such entity, officer, governing

---

[2] HHS publishes a database which lists the deemed status of health centers. *See* https://data.hrsa.gov/tools/ftca-search-tool.

[3] The impacted individual must be afforded "due process" to challenge the exclusion. Pub. L. No. 104-73, § 9, 109 Stat. 777 (Dec. 26, 1995). An accompanying proposed rule, authorized by the 1992 FSHCAA, has yet to be finalized. *See* Determination That an Individual Shall Not Be Deemed an Employee of the Public Health Service, 80 Fed. Reg. 12104-01, 2015 WL 930605 (Mar. 6, 2015).

board member, employee, or contractor of the entity is deemed to be an employee of the PHS for purposes of this section with respect to the actions or omissions that are the subject of such civil action or proceeding." 42 U.S.C. § 233(*l*)(1) (emphasis added). "Such advice" is, by statutory command, "deemed" to satisfy the scope of employment certification under § 233(c) *for purposes of removal*. *See id*. § 233(*l*)(1).

If the Attorney General (or his or her authorized representative) fails to appear, advise, *and remove* the state action, as required by § 233(*l*)(1), the deemed defendant may remove the matter to the appropriate federal district court, without any time limit. 42 U.S.C. § 233(*l*)(2); *Estate of Booker v. Greater Phila. Health Action, Inc.*, 10 F.Supp.3d 656, 664–65 (E.D. Pa. 2014). Removal automatically stays further proceedings until the district court conducts a hearing "to determine the appropriate forum or procedure; that is, to decide whether to remand the case or to substitute the United States as a party and deem the action as one brought under the FTCA." *Estate of Campbell*, 732 Fed. Appx. at 117 (construing authority and purpose of § 233(*l*)(2)) (internal quotation marks omitted).

### B.   28 U.S.C. § 1442(a)(1) Removal Jurisdiction

The federal officer removal statute, 28 U.S.C. § 1442(a)(1), affords a removal right to "any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office." 28 U.S.C. § 1442(a)(1); *see Mesa v. California*, 489 U.S. 121, 136

(1989) ("1442(a) . . . is a pure jurisdictional statute"—predicated on a colorable federal defense—"seeking to do nothing more than grant district court jurisdiction over cases in which a federal officer is a defendant").

It is well-established that the federal officer removal statute is construed broadly to protect federal interests. *See Colorado v. Symes*, 286 U.S. 510, 517 (1932) ("It scarcely need be said that such measures [allowing for federal officer removal] are to be liberally construed to give full effect to the purposes for which they were enacted."); *accord Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007) (collecting cases and observing "this Court has made clear that the statute must be 'liberally construed'") (citation omitted); *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.* (hereinafter, "*Def. Ass'n*"), 790 F.3d 457, 466–67 (3d Cir. 2015) ("Unlike the general removal statute, the federal officer removal statute is to be 'broadly construed' in favor of a federal forum) (citing *Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir.1994)). Ensuring a right to a federal forum in which to assert immunity is a fundamental purpose of § 1442. *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) ("[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court"); *Jefferson County v. Acker*, 527 U. S. 423, 447 (1999) (Scalia, J., concurring in part and dissenting in part) (observing "the main point" of § 1442 "is to give officers a federal forum in which to litigate the merits of immunity defenses").

8

Deemed PHS employees are entitled to invoke 28 U.S.C. § 1442(a)(1) as a basis for removal jurisdiction. *See, e.g., Friedenberg*, 68 F.4th at 1131–32; *Agyin*, 986 F.3d at 171, 182–83. Indeed, the United States has itself recognized deemed PHS defendants' status as federal officers (or their acting under such officers) by invoking § 1442 to effectuate removal on behalf of deemed PHS employees. *See, e.g., Oviedo v. Hallbauer*, 655 F.3d 419, 422 (5th Cir. 2011) ("The United States asserts that removal and federal jurisdiction were proper under an array of statutes—28 U.S.C. § 1442(a), governing suits against federal officers. . . ."); *Nichols v. Sabzwari*, No. 4:17-01621-RBH-KDW, 2017 WL 6389634, at *1 (D.S.C. Nov. 13, 2017) (noting U.S.'s § 1442(a)(1) removal and representation that dentist employed at grant-supported health center was "agent or employee of the USA"), *report and recommendation adopted*, 2017 WL 6367453 (D.S.C. Dec. 11, 2017).

## II.    Factual Background and Proceedings Below

Centerville receives federal funding under the PHS Act, 42 U.S.C. § 254b, to provide health care and related services to a federally-designated medically underserved population—primarily located in southwestern Pennsylvania's Washington, Greene, and Fayette Counties—regardless of any individual's insurance status or ability to pay for services. A205; 42 U.S.C. § 254b(a), (k)(3)(G)(iii). The HHS Secretary, under 42 U.S.C. § 233(g) and (h), deemed Centerville and its personnel to be federal PHS employees for all times relevant to Plaintiff's action. A96–

104 (HHS Notices of Deeming Actions for 2020–2023).

Centerville has been a multi-site community health center for more than sixty years. A194 (indicating Centerville delivered primary care and related services through thirteen fixed sites and twenty-four school-based behavioral health sites during relevant period); A199; *see also* A200–01. Centerville's patient population, like that of all health centers, is medically underserved and vulnerable: its unemployment rate, poverty rate, and rates of chronic diseases are higher than comparable state and national rates, and significant—and increasing—food and housing insecurity negatively impact Centerville's patients' health status. A196–97; A286 (letter from Congressman G. Reschenthaler) (noting Centerville's population is "vulnerable"). Barriers to patient care include the region's "rural, hilly and mountainous terrain," an "inadequate public transportation system," and the fact that "[t]here are no private primary care physicians accepting new Medicaid or uninsured patients" in Centerville's service area. A196. As Centerville informed HHS in applying for federal funding, "[m]any residents . . . rely heavily on Centerville Clinics social and medical safety net services." A197.

Among the enumerated minimum "primary health services," Centerville must, by statute, provide residents of its service area "services that enable individuals to use the services of the health center, such as "outreach . . . services." 42 U.S.C. § 254b(b)(1)(A)(iv); *see also id.* § 254b(b)(1) (enumerating all required primary health

10

services). In its application for federal funding, Centerville notified HHS it would engage in "outreach" activities "to the community to promote healthy living, eliminate unjust health disparities, and enhance the socioeconomic and environmental communities." *See* A193. Centerville described such "outreach services" activities as including "community health fairs newspapers, radio, Centerville clinics website, and social media . . . used to promote awareness of the health center's services . . . support entry into care [and] assist us in recruiting and retaining patients from the target population/service area." A204. Moreover, Centerville explained it would use its website and online platforms to inform its patient population of the availability of required sliding fee discounts, primary care services, and patient intake processes. A211; *see also* 42 U.S.C. § 254b(k)(3)(G) (requiring health centers to prepare a fee schedule and corresponding discount schedule "adjusted on the basis of the patient's ability to pay").

To maintain its federal funding, Centerville is also required to perform an annual "needs assessment" of its "medically underserved" service or "catchment area" to ensure both that its service area and health care and related services fulfill the broad purposes of 42 U.S.C. § 254b. *See* 42 U.S.C. § 254b(a)(1)(B) (defining "catchment area" as the "area served by the center"), (k)(3)(J) (requiring health centers periodically review their catchment area in part to ensure "services to be provided through the center . . . are available and accessible to the residents of the

11

area promptly and as appropriate"); *see also generally* HHS, Health Resources and

Services Administration, *Health Center Program Compliance Manual*, Ch. 3: Needs

Assessment (2018), https://bphc.hrsa.gov/compliance/compliance-manual/chapter3.

As Centerville informed HHS in its approved application for federal funding for the

relevant period, Centerville continually assesses:

> the need for health services in the catchment area of the center based on the
> population served, or proposed to be served, utilizing, but not limited to, the
> following factors: (1) Available health resources in relation to the size of the
> area and its population . . . . (2) Health indices for the population of the area; (3)
> Economic factors affecting the population's access to health services. . . ; and
> (4) Demographic factors affecting the population's need and demand for health
> services. . . .

A195; *see also* A201 ("Based on . . . ongoing assessment of . . . needs, the health care

services that we offer are the most appropriate for the needs of our target population.").

Centerville's federal funding is likewise conditioned on its maintenance of "an

ongoing quality improvement system that . . . maintains the confidentiality of patient

records." 42 U.S.C. § 254b(k)(3)(C). So too is its status as a deemed PHS employee.

In its application to be so deemed, Centerville was required to assure HHS it would

"implement and maintain systems and procedures for protecting the confidentiality of

patient information and safeguarding this information against loss, destruction, or

unauthorized use, consistent with federal and state requirements," because HHS has

identified "confidentiality and security" of patient information as one of the

"areas/activities of highest clinical risk for the health center." *See* PAL 2021-01, at 11–

12, 16, https://bphc.hrsa.gov/sites/default/files/bphc/compliance/pal-2021-01_0.pdf.

On or about May 8, 2023, Plaintiff filed her civil action in the Washington County, Pennsylvania Court of Common Pleas, alleging Centerville: (1) owes various duties to Plaintiff and the putative class members—arising out of their patient-provider relationship—"to safeguard and protect" their personal information from "unauthorized disclosure," (2) breached those duties by failing to implement and maintain reasonable security procedures and practices and, as a result, (3) harmed Plaintiff and the putative class members. A43–49, ¶¶ 1–26. Centerville, per Plaintiff's complaint, "encourages its patients to use its Online Platforms for booking medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, and more." A45, ¶ 6. At the heart of Plaintiff's complaint is the allegation that Centerville "knowingly configured and implemented a software device known as a Tracking Pixel . . . to collect and transmit information from [its website] and related mobile applications . . . to third parties." A45, ¶ 5. Per the complaint, Centerville utilized the software to "improve and to save costs on [Centerville's] marketing campaigns, improve its data analytics, and attract new patients." A49, ¶ 23.

On May 18, 2023, Centerville became aware of and delivered Plaintiff's complaint to HHS's designated representative, as required by 42 U.S.C. § 233(b), A106, and, as a courtesy, to the United States Attorney's Office for the Western

District of Pennsylvania. A108–09.

On June 1, 2023, fourteen days after receiving notice, the Attorney General—through local Assistant United States Attorney ("AUSA") Kezia O. L. Taylor—appeared in state court, ostensibly "for the limited purpose of notifying the Court as to whether the Secretary of the U.S. Department of Health and Human Services. . . has advised that Centerville Clinics, Inc. has been 'deemed' to be an 'employee of the Public Health Service' with respect to the actions or omissions that are the subject of this civil action" as required by 42 U.S.C. § 233(*l*)(1). A93. Having appeared and faithfully recited the governing statutory language, however, the Attorney General's designee failed to perform the second of the two tasks § 233(*l*)(1) imposes. Rather than notify the state court as to whether the Secretary had deemed Centerville to be a PHS employee under 42 U.S.C. § 233(g) and (h) with respect to the period in which the events giving rise to this action occurred, the AUSA instead indicated there was nothing to report. A93–94. ("At present, HHS . . . has not yet provided its report as to whether the deemed status of Centerville. . . . extends to the acts or omissions that are the subject of this civil action.").

On June 15, 2023, Centerville removed this action to the United States District Court for the Western District of Pennsylvania pursuant to 42 U.S.C. § 233(*l*)(2) and 28 U.S.C. § 1442. A19–21, ¶¶ 6–9. On July 14, 2023, Plaintiff moved to remand the matter to state court and requested attorney's fees. A13. Centerville opposed, and the

motion was fully briefed as of September 7, 2023. A14.

On September 14, 2023, without oral argument, the Court issued an order remanding the case to state court, based on its conclusions that Centerville (1) lacked authority to remove the case under § 233 because "the Attorney General had made a timely appearance" in the state court; and (2) improperly removed under § 1442 because "[t]o permit Centerville to raise § 233, when it didn't abide by the removal procedures of § 233 would sidestep the framework of § 233." A6–7. The district court remanded "without prejudice to the United States Attorney General removing the action upon making the requisite scope certification." A8; *see also* A6 ("Centerville needed to wait for the appropriate authorities to make the relevant determinations as stated in § 233, rather than take matters into its own hands.").

The next day, Centerville moved to stay the remand order. A14. Plaintiff's opposition to Centerville's stay motion included a September 19, 2023 notice filed by the Attorney General in state court, advising that "the United States Attorney for the Western District of Pennsylvania has determined that Centerville . . . is not deemed to be an employee of the Public Health Service with respect to the alleged acts or omissions giving rise to this case." A351–52.

On September 20, 2023, the district court denied Centerville's motion to stay in a text-only docket entry. A353, ECF. No. 31. Centerville noticed this appeal the same day. A1–2, 15.

## STANDARD OF REVIEW

The district court determined it lacked subject-matter jurisdiction under 42 U.S.C. § 233 and 28 U.S.C. § 1442. Issues of subject-matter jurisdiction, "including a court's decision to remand for a lack of jurisdiction," are reviewed *de novo*. *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 810 (3d Cir. 2016); *accord Maglioli v. All. HC Holdings LLC*, 16 F.4th 393, 402–03 (3d Cir. 2021).

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Centerville, a community health center recipient of federal funding under Section 330 of the Public Health Service (PHS) Act, 42 U.S.C. § 254b *et seq.*, has been deemed by the HHS Secretary to be a federal PHS employee for purposes of the protection afforded by the FSHCAA, *as amended and codified at* 42 U.S.C. § 233(g) *et seq*. HHS's annual Notices of Deeming Action unequivocally confirm Centerville's federal status and immunity for the relevant period. A97–104 (Notices of Deeming Action for Calendar Years 2020–2023). The deemed status promises absolute immunity from any civil action or proceeding resulting from the health center's performance of (or alleged failure to perform) "medical . . . or related functions" within the scope of its deemed PHS employment. *Id*. § 233(a), (g); *Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009) (immunity confers right to be free from "the concerns of litigation"); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (official immunity is "an entitlement not to stand trial or face the other burdens of litigation").

16

The underlying state court action against Centerville resulted from Centerville's alleged failure to adequately perform a function every health center must carry out as a condition of federal funding and federal employee status: "maintain[] the confidentiality of patient records." 42 U.S.C. § 254(b)(3)(C). Several federal courts—exercising removal jurisdiction under either 42 U.S.C. § 233(*l*)(2) or 28 U.S.C. § 1442—have correctly determined that deemed PHS defendants are immune from such claims. The HHS Secretary cannot deem a health center to be a PHS employee without a determination that it "has implemented appropriate policies and procedures to reduce the risk of malpractice and the risk of lawsuits arising out of any health or health-related functions performed by the entity." 42 U.S.C. § 233(h)(1).

To preserve and assert its claimed immunity, Centerville removed the action pursuant to two alternative statutes: 42 U.S.C. § 233(*l*)(2), available to "*any* entity" receiving § 254b funding, and 28 U.S.C. § 1442(a)(1), available to "*any* officer (or *any* person acting under that officer) of the United States or of any agency thereof" subject to the removal procedures. 42 U.S.C. § 233(*l*)(2); 28 U.S.C. § 1442(a)(1). Both provisions, in broad language, plainly serve a single purpose: "to have the validity of the defense of official immunity tried in a federal court." *Willingham,* 395 U.S. at 407 (construing 28 U.S.C. § 1442).

The district court's September 14, 2023 remand order hinges on the clearly erroneous finding that Centerville *was not* deemed to be a federal PHS employee when

the events giving rise to this action occurred. On that mistaken finding, the district court misperceived its jurisdiction (and duty) to make the threshold immunity determination the law demands. Centerville's deemed federal status—for the relevant period and for purposes of § 233(a) immunity—is both *irrefutable* and *irrevocable* as a matter of law. 42 U.S.C. § 233(g)(1)(F). That status supplies federal removal jurisdiction under both 42 U.S.C. § 233(*l*)(2) and 28 U.S.C. § 1442, both enacted to ensure that, where appropriate, the United States is substituted, even over its objection, in place of the federal defendant. *See, e.g.*, *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417 (1995) (holding Attorney General's certifications subject to judicial review); *Campbell*, 732 Fed. Appx. at 117 ("For section 233(*l*)(2) to have any effect, a district court must at least have jurisdiction to substitute the United States when it is appropriate to do so."); HHS Notice of Proposed Rulemaking, Federally Supported Health Centers Assistance Act of 1992, 59 Fed. Reg. 42790-01 (Aug. 19, 1994) (HHS and the Attorney General assured health centers Attorney General certification as to any "particular claim or case . . . is subject to judicial review"); *see also Agyin v. Razmzan,* 986 F.3d 168, 179 (2d Cir. 2021) (holding deemed PHS defendants have separate and alternative removal rights under 42 U.S.C. § 233(*l*)(2) and 28 U.S.C. § 1442).

Beyond that fundamental flaw, the district court otherwise badly misreads the two officer removal statutes at issue. First, it misconstrues the FSHCAA's removal

provision, 42 U.S.C. § 233(*l*)(1)–(2), with a thumb on the scale *against* federal jurisdiction. If permitted to stand, the remand order would improperly allow the Attorney General to "game the system," transforming its nondiscretionary duty to facilitate a deemed federal employee's access to a federal forum into a mechanism by which it has unfettered discretion to preclude removal and judicial review of its own unilateral (and disputed) immunity determination. Second, the order summarily rejects Centerville's invocation of 28 U.S.C. § 1442(a)(1), failing to recognize it as a separate and alternative basis for removal jurisdiction, instead misperceiving "the removal procedures of § 233" as a prerequisite to § 1442(a)(1). A7.

This Court should reverse the district court's decision and order to the extent it was based on the erroneous conclusion that it lacked jurisdiction to consider Centerville's immunity; vacate the district court's remand order; and remand to the district court with instructions to determine the appropriate forum and procedure for this action in light of Centerville's deemed federal employee status.

## ARGUMENT

## I.    Removal was Substantively and Procedurally Proper Under 42 U.S.C. § 233

Removal was substantively and procedurally proper under 42 U.S.C. § 233. The FSHCAA removal provisions at issue—§ 233(*l*)(1) and (2)—serve an unmistakable purpose: to facilitate access to a federal forum for a threshold determination as to whether plaintiff's exclusive remedy is against the United States. *Booker v. United*

19

*States*, No. 13-cv-1099, 2015 WL 3884813, at \*7 (E.D. Pa. June 24, 2015) (recognizing "removal pursuant to § 233(*l*)(2) serves the same purpose as procedure contemplated by [28 U.S.C.] § 2679(d)(3)"). To the extent the district court failed to recognize its jurisdiction under 42 U.S.C. § 233, its decision ignores settled principles, contravenes statutory text, and undermines legislative purpose.

### A.   42 U.S.C. § 233(*l*)(2) Must Be Broadly Construed In Favor Of A Federal Forum And With A Presumption Of Judicial Review

The district court failed to consider and apply two well-settled principles affecting its removal jurisdiction: first, that statutes providing for federal officer removal must be construed broadly in favor of a federal forum; and second, that absent a clear indication to the contrary, courts should proceed from the strong presumption that Congress intends judicial review of Executive action.

42 U.S.C. § 233(*l*)(2), like other officer removal statutes, must be broadly construed in favor of a federal forum. *See Campbell*, 732 F. App'x. at 116–17 (§ 233(*l*)(2) "grants a district court jurisdiction to . . . decide whether to remand the case or to substitute the United States as a party and deem the action as one brought under the FTCA"); *cf. Willingham*, 395 U.S. at 407 ("Congress has decided that federal officers, and indeed the Federal Government itself, require the protection of a federal forum") (construing § 1442). Instead of construing § 233(*l*)(2) in favor of removal, the remand order invokes cases that apply a presumption *against* removability, as if this case had been removed under the general removal statute (28 U.S.C. § 1441), where

removal is governed by the "well pleaded complaint rule"—a doctrine which, absent diversity, bars removal if a federal question does not appear on the face of the complaint. A5 (citing *Allen v. Christenberry*, 327 F.3d 1290, 1293 (11th Cir. 2003) (construing 42 U.S.C. § 233 removal provisions "narrowly, with doubts resolved against removal") and *Young v. Temple Univ. Hosp.*, No. 18-cv-2803, 2019 WL 109388 at *1 (E.D. Pa. Jan. 3, 2019) (citing 28 U.S.C. § 1441, "removal statutes are strictly construed and all doubts are resolved in favor of remand")).

As this Court held in *Campbell*, § 233(*l*)(2) grants "district courts [] jurisdiction to conduct hearings and make determinations . . . even when a non-diverse federal employee defendant has been sued under state law." *Estate of Campbell*, 732 F. App'x. at 116. Because § 233(*l*)(2) is a jurisdictional statute, it necessarily functions as an exception to the well-pleaded complaint rule's presumption against removal. As explained there, "[a]bsent an implied grant of subject matter jurisdiction, section 233(*l*)(2)'s provision permitting removal would be superfluous [because the] only defendants who would ever seek removal under that section would be those who could not seek removal based on diversity of citizenship or a federal question." *Id*. at 116.

Section 233(*l*)(2)'s federal subject matter jurisdiction is predicated on the defendant's *federal* status and *federal* immunity. *See* 42 U.S.C. § 233(a), (g), (*l*)(1)–(2) (removal mechanism available to "any entity" or personnel of "the entity named" that the Secretary has deemed to be a PHS employee); *Campbell*, 732 Fed. Appx. at

21

117 (construing § 233(*l*)(2) as a "procedure[] under which a state court defendant who believes he is immune from suit under section 233(a) may bring the United States into the case").

Moreover, the clear and commanding language of § 233(*l*)(2) defies a narrow construction. It makes removal mandatory ("shall be removed") upon the request of "any" deemed defendant, without any time limit, and thereafter imposes a mandatory stay of all proceedings pending a "hearing" and a judicial determination as to whether § 233(a) immunity applies to the particular lawsuit at issue. 42 U.S.C. § 233(*l*)(2). The core requirement for removal—which is also § 233(*l*)'s jurisdictional basis—is that the removing defendant was previously deemed by the HHS Secretary to be a PHS employee for the period in which the events giving rise to the claim occurred. 42 U.S.C. § 233(*l*)(1) (referencing a deeming determination under "subsections (g) and (h)"). The HHS Secretary afforded Centerville that federal status and immunity—for the relevant period—through irrefutable and irrevocable deeming determinations. A97–104; 42 U.S.C. § 233(g)(1)(F).

The district court ignored a second presumption—"federal judges traditionally proceed from the 'strong presumption that Congress intends judicial review' of executive branch action. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 424 (1995) (citing *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967)). The district court's

reading of § 233(*l*)(2) produces an untenable result, contrary to well-settled immunity jurisprudence: it would afford the Government—as a self-interested party—the ability to make *unreviewable* decisions (as the judge in its own case) that affect the fundamental rights of parties to litigation. *Cf. Gutierrez de Martinez*, 515 U.S. at 428, 434 ("Because [28 U.S.C. § 2679(d)] is reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review and that mechanical judgments are not the kind federal courts are set up to render.").

The district court's reading of § 233(*l*) not only reverses the strong presumption in favor of judicial review but "would oblige this Court to attribute to Congress two highly anomalous commands." *Gutierrez de Martinez*, 515 U.S. at 426. First, the Court would have to accept that whenever the Attorney General appears in state court— either before the fifteen-day period or at any time thereafter (including after removal)—Congress authorized the Attorney General to sit as an unreviewable judge in its own case. *Id*. Under such a reading, the Attorney General can effectively block a deemed defendant's access to a federal court—to challenge its failure or refusal to certify—simply by appearing in state court even after the case is removed to federal court. Worse, the district court "cast[s] Article III judges in the role of petty functionaries, persons required to rubber-stamp the decision" of the Attorney General, "but stripped of capacity to evaluate independently whether that decision is correct."

*Gutierrez de Martinez*, 515 U.S. at 426. As the Supreme Court has long recognized, when Congress intends to preclude judicial review, it does so through a clear statement. *See id*. at 424–25, 429. For example, with respect to decisions by HHS's Provider Reimbursement Review Board, Congress expressly stated that certain final agency decisions "shall not be reviewed by the Board or by any court." 42 U.S.C. § 1395oo. Section 233(*l*) makes no such statement.

**B.    The Plain Text of § 233(*l*) Confers Removal Jurisdiction Here**

On a plain reading of § 233(*l*)(1), the Attorney General's appearance in state court—because Centerville was deemed to be a PHS employee when the events giving rise to this action occurred—should have resulted in removal to federal court. 42 U.S.C. § 233(*l*)(1). Indeed, the only plausible reading of subsection (*l*)(1)— especially given its pre-existing analog in 28 U.S.C. § 2679(d)—is that it provides for removal and a federal forum regardless of whether the Attorney General issues a favorable scope of employment certification (the scenario contemplated by § 2679(d)(2)) or an unfavorable one (the scenario contemplated by § 2679(d)(3)). *Hui*, 559 U.S. at 811 ("We agree with petitioners that there is no reason to think that scope certification by the Attorney General is a prerequisite to immunity under § 233(a).").

Section 233(*l*)(2) expressly calls on the Attorney General to appear *and* advise the state court as to whether the *Secretary* issued a "final and binding" deeming determination pursuant to § 233(g) and (h) with respect to the period in which the

events giving rise to the claim occurred. By congressional command, "[s]uch advice" is deemed to satisfy § 233(c) for purposes of removal. 42 U.S.C. § 233(*l*)(1). The Attorney General's appearance, as contemplated by § 233(*l*)(1), is thus equated with, and requires, removal. The district court's contrary decision rests on several misunderstandings of key statutory language and a failure to read relevant provisions within the statute's overall structure.

First, and fundamentally, the district court misreads § 233(*l*)(1) as being satisfied when the Attorney General only partially performs what that section commands. Section 233(*l*)(1) provides that on notification of a state court action against a deemed individual or entity (as confirmed by a Notice of Deeming Action), the Attorney General must: (1) appear in that court within fifteen days of notice of the lawsuit to (2) report whether the "Secretary has determined under subsections (g) and (h) of [42 U.S.C. § 233] that such entity . . . is deemed to be an employee of the Public Health Service for purposes of this section with respect to the actions or omissions that are the subject of such civil action or proceeding." 42 U.S.C. § 233(*l*)(1). Through a prompt appearance (before the typical deadline for a responsive pleading) to report the defendant's federal status, the provision protects against default judgment and exposure to the burdens of litigation pending the federal court's determination as to whether the United States is the proper defendant.

When the district court issued its remand order, the Attorney General had only

25

appeared in state court to advise that the Secretary had not made a recommendation

and the "United States Attorney" had not yet made a determination. A6

(acknowledging Attorney General "appeared [in state court] but hadn't yet advised

on the certification"), A93–94 (Gov't Not. to State Court). The district court's

conclusion that this appearance alone was sufficient to divest Centerville of its

statutory right to remove the case to federal court contravenes statutory text, which

plainly imposes a two-part obligation on the United States. *See* 42 U.S.C. § 233(*l*)(1).

Second, the district court failed to recognize the import of the HHS Secretary's

"final and binding" deeming determination under § 233(g) and (h) for purposes of §

233(*l*)'s removal provision, instead reading into § 233(*l*)(1) a requirement that the

Secretary—prior to any removal—make a "scope determination" separate and apart

from its deeming determination. A6 ("Section 233(*l*)(1) says that the Secretary must

make the *scope determination* 'with respect to the actions or omissions that are the

subject of such civil action or proceeding.'") (emphasis added). The sole

determination § 233(*l*)(1) contemplates is the one it expressly references—*i.e.*, the

determination "under subsections (g) and (h)." 42 U.S.C. § 233(*l*)(1). Those

subsections speak to the Secretary's prospective, binding deeming determination. *See*

42 U.S.C. § 233 (g)(1)(A) (deemed status afforded in "calendar year" increments),

(D) (Secretary "shall prescribe" the form and manner of the "application"), (E)

("Secretary shall make a determination . . . within 30 days after receipt of an

application" and a favorable "determination . . . shall apply for the period specified by the Secretary"). The advance deeming determination "under subsections (g) and (h)" is a readily ascertainable fact—reflected in an official deeming notice per calendar year.

The connection § 233(*l*)(1) draws between the Secretary's determination and "the actions or omissions that are the subject of such civil action or proceeding" provides neither invitation nor authority for a second determination capable of undoing the Secretary's "final and binding," prospective, calendar-year deeming determination. 42 U.S.C. § 233(g)(1)(F), (*l*)(1). The phrase "actions or omissions that are the subject of such civil action or proceeding" simply reflects the reality that deemed status—as HHS makes clear—is comparable to an occurrence-based insurance policy, which covers claims arising out of events within a period for which the policy was in place, regardless of when the claim is actually made. *See, e.g.,* A104 (Notice of Deeming Action for CY 2023, affording protection "comparable to an 'occurrence' policy without a monetary cap"); HRSA, Federal Tort Claims Act: Health Center Policy Manual at 6–7 § B.4, https://bphc.hrsa.gov/sites/default/files/bphc/compliance/ftcahc-policy-manual.pdf ("FTCA malpractice immunity is similar to an occurrence insurance policy. Occurrence coverage is a form of insurance that provides coverage for actions and omissions that take place during the time that the policy is in effect, regardless of

when the claim is filed.").

The simple question § 233(*l*)(1) asks is whether the named defendant was deemed for the period in which the alleged acts or omissions occurred. The answer is a function of two identified variables: (1) the date of the alleged injury (supplied by the complaint) and (2) the deemed status of the named defendant on that date (supplied, if at all, by a Notice of Deeming Action). Where, as here, the named defendant was deemed for the period in which the alleged conduct occurred, the Attorney General must report that information to the state court within fifteen days to effectuate removal. 42 U.S.C. § 233(*l*)(1); A96–104. If the Attorney General "fails" to do so—*i.e.*, "fails" to achieve § 233(*l*)(1)'s singular purpose—the deemed PHS defendant may remove the action itself. *Id*. § 233(*l*)(2).

The district court likewise misperceived other "relevant determinations" as prerequisites to removal, such as the Attorney General's 42 U.S.C. § 233(c) scope of employment certification. A6–7.[4] As the Supreme Court determined more than a decade ago, "there is no reason to think that scope certification by the Attorney

---

[4] The district court's order denying Centerville's motion to stay doubles down on this mistaken premise, finding that its appeal has no chance of success because "the *Attorney General* has *deemed* [Centerville] *to not be* a PHS employee." A15 (Minute Entry 31) (emphasis added). That finding is clearly erroneous because Attorney General has no authority to make deeming determinations. That authority is vested exclusively in the HHS Secretary, whose determinations bind the Attorney General. 42 U.S.C. § 233(g)(1)(F).

General is a prerequisite to immunity under § 233(a)." *Hui*, 559 U.S. at 811. "To be sure . . . immunity is contingent upon the alleged misconduct having occurred in the course of the PHS defendant's duties, but a defendant may make that proof pursuant to the ordinary rules of evidence and procedure." *Id*. Indeed, the Secretary's advance deeming determination is "deemed to satisfy the provisions of [§ 233(c)]," for the purpose served by the FSHCAA's removal provision—*i.e.*, removal. 42 U.S.C. § 233(l)(1). It is no coincidence that § 233(*l*)(2) mandates a "stay" pending a "hearing," and a resulting federal judicial determination as to whether to substitute the United States in place of the deemed PHS defendant. *Id*. § 233(*l*)(2). The statute is carefully structured to afford a federal forum at the earliest opportunity to resolve the threshold immunity issue.

Finally, the remand order mischaracterizes decisions of the Second and Ninth Circuits—as well as of various district courts within and outside those circuits—as "distinguishable" because the "Attorney General never appeared in state court (not, as here, where he appeared but hadn't yet 'advised' on the certification)." A6. Those courts, albeit on slightly different records, read the statute correctly. *See e.g.*, *Agyin*, 986 F.3d at 184–85; *Friedenberg*, 68 F.4th at 1131–32 (reversing remand order in action deemed PHS defendants removed pursuant to 28 U.S.C § 1442 and 42 U.S.C. § 233(*l*)(2), and substituting United States over its objection). In contrast, by seizing on a factual distinction (without a difference), the decision below would effectively

transform a nondiscretionary duty imposed on the Attorney General to facilitate access to a federal forum into a mechanism by which the Attorney General has unfettered discretion to preclude removal and judicial review of his own unilateral (and disputed) immunity determination. As *Campell* made clear, § 233(*l*)(2) gives district courts, not the Attorney General, the authority to decide "when it is appropriate" to substitute the United States in place of a deemed defendant. *Estate of Campbell*, 732 F.3d at 117.

### C. The Unmistakable Thrust and Purpose of § 233(*l*)(2) Support Removal Jurisdiction Here

The remand order reverses the unmistakable thrust and purpose of § 233(*l*)(2) by misconstruing its preliminary phrase—"If the Attorney General fails to appear in State court within the time period prescribed under paragraph (1)"—as if it read as follows: "if the Attorney General does appear within the time prescribed under paragraph (1), the case shall *not* be removed." The statute says no such thing. The "appearance" contemplated by § 233(*l*)(2) is defined in § 233(*l*)(1). Section 233(*l*)(1) equates the Attorney General's appearance and advice with removal by unequivocally providing that "[s]uch advice shall be deemed to satisfy the provisions of subsection (c)," which in turn *requires removal*. 42 U.S.C. § 233(*l*)(1). Thus, the phrase "[i]f the Attorney General fails to appear in State court within the time period prescribed under paragraph (1)," means "if the Attorney General fails to appear and advise and therefore remove the case to federal court," the deemed PHS defendant may do so. *Celestine v.*

*Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 81 (2d Cir. 2005) ("§ 233(*l*)(1) *unambiguously states* that the Attorney General's appearance before the [state] court shall be deemed to 'satisfy' the provisions of § 233(c)") (emphasis added); *Allen*, 327 F.3d at 1294 (observing § 233(*l*) notification process "also amounts to a certification that the employee was acting within the scope of his employment" and that if "HHS has determined that the employee is deemed an employee of PHS . . . the Attorney General must remove the case to federal court").

The FSHCAA's legislative history buttresses its text, in particular the two-part obligation § 233(*l*)(1) places on the Attorney General. That obligation arises from Congress's recognition that the Attorney General's role as envisioned in the 1992 FSHCAA hindered the Act's purpose. Under the FSHCAA of 1992, the Attorney General was responsible for removals with respect to Section 330 health centers and their employees. Pub. L. No. 102-501. Thus, health centers enjoyed the benefit of § 233(c)'s removal at "any time before trial" but depended on the Attorney General to act. H.R. Rep. No. 104-398 at 7 (noting under 1992 FSHCAA, "the Attorney General is responsible for securing the removal to Federal Court . . . . However current law contains no provision concerning the timelines of such a response"). During FSHCAA's 1992–1995 pilot phase, the Attorney General frustrated its objectives by, for example, second-guessing decisions of the Secretary and failing to promptly remove state actions to federal court. *See id.* And little surprise, as the Attorney

31

General vigorously opposed the immunity at issue from its inception, (mis)characterizing it as a "radical" expansion of tort liability coverage for health center providers and "the antithesis of sound fiscal management and the responsible delivery of quality medical care." *Federally Assisted Health Clinics Legal Protection Act of 1991: Hearing on H.R. 2239 Before H. Subcomm. On Administrative Law and Governmental Relations of the Comm. on the Judiciary*, 102d Cong. 17 (July 17, 1991) (statement of Stuart M. Gerson, Assistant Attorney General, Civil Division, U.S. Dept. of Justice).

The 1995 FSHCAA amendments were designed in part to remedy the problems caused by the Attorney General's authority under the 1992 legislation. In particular, the amendments significantly restricted the Attorney General's authority by: removing the requirement for HHS to have a "consultation with the Attorney General" prior to making a deeming determination; making the Secretary's prospective deeming decision "final and binding" on the Attorney General; imposing a mandatory duty on the Attorney General to appear in state court and advise it as to the Secretary's deeming determination within fifteen days of notice of suit; and, making that appearance satisfy § 233(c) for purposes of removal and access to a federal forum. *Compare* FSHCAA of 1992, Pub. L. No. 102-501 *with* FSHCAA of 1995, Pub. L. No. 104-73.

The 1995 amendments also added the removal right at issue here, which not

only affords an automatic and immediate stay of proceedings—to preserve the status quo and prevent irreparable harm to the federal employee's immunity—but also imposes an obligation on the federal court to "conduct a hearing" to make the threshold immunity determination. The fifteen-day period was intended to provide the Attorney General time to confirm whether the Secretary had deemed the defendant to be a PHS employee with respect to the period in which plaintiff's claims arose. That Congress afforded fifteen days for this nondiscretionary task reflects its ministerial nature—*i.e.*, reporting the prior "final and binding" determination of the Secretary as to the relevant period—not a scope of employment certification that is fact-specific and governed by the law of place.

Contrary to the decision below, A6–7, § 233(*l*) does not contemplate that the Attorney General would have already made its scope of employment certification at that time. First, the inquiry is generally fact-intensive, employing the law of the place. *See* 28 U.S.C. § 1346(b)(1); *Agyin*, 986 F.3d at 184 (noting "fact-dependent multi-factor inquiry [required] for determining whether an act was performed within an employe's scope of employment"). Second, such a reading would render § 233(*l*)(1) superfluous given the existence and function of § 233(c). In other words, § 233(*l*) provides for removal by: (1) the Attorney General when the Attorney General has not yet certified that a deemed PHS employee acted within the scope of employment; or (2) the deemed defendant should the Attorney General fail to fulfill

33

its two-part obligation under § 233(*l*)(1).

Simply put: the district court's rendering of the statute would leave deemed defendants worse off when the Attorney General appears in state court—but fails to provide that court the information § 233(*l*)(1) commands—than if the Attorney General simply ignored the deemed defendant altogether.

## II.    As A Deemed Public Health Service Employee, Centerville Properly Removed This Matter Under 28 U.S.C. § 1442(a)(1)

Centerville, deemed to be a PHS employee for purposes of the official immunity available to it under 42 U.S.C. § 233(a), qualifies as a federal officer or person acting under a federal officer sued in a "civil action . . . commenced in state court . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1); *see also Willingham*, 395 U.S. at 407 (concluding policy animating officer removal statute "should not be frustrated by a narrow, grudging interpretation of 1442(a)(1)"). The district court summarily, and improperly, rejected removal jurisdiction under 28 U.S.C. § 1442(a)(1), holding, without further analysis, that "[t]o permit Centerville to raise § 233 as a defense for purposes of § 1442, when it didn't abide by the removal procedures of § 233, would sidestep the framework of § 233." A7 (citing *Nye v. Hilo Med. Ctr.*, No. 09-220, 2010 WL 931926, at *3 (D. Haw. Mar. 11, 2010)). The district court's failure to meaningfully engage with § 1442 as a basis for removal jurisdiction is evident on the face of its decision, which (1) does not appear to analyze at all whether Centerville qualifies as a federal officer and (2) reduces the four-part "acting under"

34

analysis in § 1442(a)(1) to a single element meriting explicit mention. *Id.* The district court was correct in observing "[t]o invoke removal under § 1442, Centerville must show, among other things, that its removal 'raises a colorable federal defense to the plaintiff's claims.'" *Id.* What follows is in error. First, the district court erred in failing to ever delineate or consider those "other things" necessary to § 1442 removal jurisdiction. Second, the district court's three-sentence analysis of the single element it did consider—the existence of a colorable federal defense—ignores the governing legal framework and conflicts with established Circuit precedent. The district court's citation to an unpublished, out of Circuit, district court case—decided more than a decade ago—as the sole authority in support of its conclusion does little to bolster its erroneous holding. A7.

HHS's designation of Centerville as a deemed PHS employee—memorialized in annual notices of deeming action—affords Centerville the same right to absolute immunity under § 233(a) as that available to "any commissioned officer or employee" of the PHS. 42 U.S.C. § 233(a), (g)(1)(A) (affording "the same" immunity to deemed PHS employees); *see also Agyin*, 986 F.3d at 179–80 (holding 28 U.S.C § 1442 and 42 U.S.C. § 233(*l*)(2) afford deemed PHS defendants independent and distinct removal rights); *Ford v. Sandhills Med. Found., Inc.*, No. 4:21-cv-02307-RBH, 2022 WL 1810614, at *3 n.5 (D.S.C. June 2, 2022) (concluding 28 U.S.C. § 1442(a)(1) provides deemed PHS defendant "a vehicle for removal" even if 42 U.S.C. § 233(*l*)(2) does

not). The district court's contrary conclusion should be reversed.

### A. Centerville Is A Federal Officer Sued for or Relating to Acts Under Color of Office Within the Meaning of 28 U.S.C. § 1442

Centerville, a deemed PHS employee, is a federal officer—sued for or related to acts under color of office—within the meaning of 28 U.S.C. § 1442(a)(1). Ordinary meaning, relevant history, and well-established judicial interpretation make clear that PHS employees—and those deemed equivalent for federal immunity—may, as federal officers, invoke 28 U.S.C. § 1442(a)(1) to have the merits of their immunity defenses determined in federal court.

### 1. Centerville Is a Federal Officer

Because the statute does not define "officer," the term should be given its "well settled meaning." *Sekhar v. United States*, 570 U.S. 729, 732 (2013). The ordinary meaning of "officer," however, is varied and broad. *See Officer, Black's Law Dictionary* (11th Ed. 2019) (defining "officer" as "[s]omeone who holds an office of trust, authority, or command. In public affairs, the term refers esp. to a person holding public office under a national, state, or local government, and authorized by that government to exercise some specific function"); *Officer, Ballentine's Law Dictionary* 881 (3d Ed. 1969) (noting that "officer" is "[a] term of vague and variant import, the meaning of which varies necessarily with the context and circumstances surrounding the use of the term"). Equally broad is the term "office," on which the meaning of "officer" necessarily turns. *See Office, Black's Law Dictionary* ("A position of duty,

trust, or authority, esp. one conferred by a governmental authority for a public purpose.").

Section 1442's history, context, and purpose underscore the term's broad meaning. Each indicate that "officer," as employed in § 1442(a)(1), encompasses all federal employees, *i.e.*, all individuals holding a position of duty, trust, or authority conveyed to them by a governmental authority for a public purpose. *Cf. id.* The current federal officer removal statute is rooted in a series of early statutes enacted to protect federal officials from prosecution by state authorities hostile to the federal laws those officials were charged with enforcing. *See Watson*, 551 U.S. at 147–48; *Willingham*, 395 U.S. at 405–06 (recounting history of federal officer removal statutes). These early, precursor statutes authorized removal by only certain types of federal officers. *See* Act of Feb. 4, 1815, ch. 31, §§ 6, 8, 3 Stat. 197–98 (authorizing removal by federal customs officers and "any other person aiding or assisting" such officers); Act of Mar. 2, 1833, ch. 57, § 3, 4 Stat. 633 (authorizing removal by "any officer of the United States, or other person, for or on account of any act done under the revenue laws of the United States"); Act of July 13, 1866, ch. 184, § 67, 14 Stat. 171–72 (authorizing removal of suit against revenue officer "on account of any act done under color of his office," or "any person acting under or by authority of any such officer" "for the collection of taxes"). In 1948, Congress expanded the right of removal to encompass all federal officers and employees. *See* Act of June 25, 1948, ch. 646, § 1442, 62 Stat.

938. Although the statute, like its predecessors, employs the term "officer," the companion House Report described the amendment as "extend[ing removal] to apply to all officers and employees of the United States or any agency thereof." H.R. Rep. No. 80-308, at A134 (1947).

In considering and discussing the applicability of the statute in various contexts, the United States Supreme Court has interchangeably utilized the terms "officer," "official," "agent," and—even before 1948—"employee" to refer to parties entitled to invoke § 1442 and its predecessor statutes. *See, e.g., Watson*, 551 U.S. at 142, 150 (referring to those within the ambit of the officer removal statute as "officers and agents" of the government "acting . . . within the scope of their authority") (quoting *Willingham*, 395 U.S. at 406); *Jefferson Cnty.*, 527 U.S. at 446 (noting that 1442 exception to well-pleaded complaint rule applies to "defenses asserted by *federal officials* . . . for acts under color of office or in the performance of official duties.") (internal quotations omitted); *Willingham* 395 U.S. at 403 ("This case raises some important questions about the power of *federal officials* to have actions brought against them removed to the federal courts."); *Symes*, 286 U.S. at 517–18 (observing that "*[f]ederal officers and employees* are not, merely because they are such, granted immunity from prosecution in state courts for crimes against state law"); *Tennessee v. Davis*, 100 U.S. 257, 263 (1880) (observing federal government "can only act through its *officers and agents*, and they must act within the States") (added emphasis in all).

Courts have consistently permitted a wide variety of federal employees to remove cases against them to federal court by invoking § 1442(a)(1), including cases brought against government-employed medical professionals. *See, e.g., Willingham*, 395 U.S. at 403 (prison warden and prison's chief medical officer); *Osborn v. Haley*, 549 U.S. 225, 234 (2007) (Forest Service employee on whose behalf United States removed, citing § 1442); *Arizona v. Manypenny*, 451 U.S. 232, 234 (1981) (Customs and Border Patrol agent).

For its part, the United States has, for decades, invoked § 1442(a)(1) as a basis for removal on behalf of deemed PHS defendants. *See, e.g., Gabriel v. Alger*, 2015 WL 1042507 at *1 (D. Colo. Mar. 5, 2015) (removing case brought against deemed PHS employee under 28 U.S.C. § 1441(a) and 1442(a)(2)); *Rosenblatt v. St. John's Episcopal Hosp.*, 2012 WL 294518 at *1 (E.D.N.Y. 2012) (removing under 1441(a), 1442(a)(1), and 2679(d)(2)); *Demers v. Buonanno*, 2012 WL 5930223, at *2 (D.R.I. Nov. 2, 2012) (United States removed state court subpoena for deposition testimony of a deemed PHS employee pursuant to 28 U.S.C. § 1442 and successfully moved to quash subpoena as testimony would "disrupt [deemed PHS employee's] official duties and not promote DHHS's objectives"), *report and recommendation adopted*, 2012 WL 5940568 (D.R.I Nov. 27, 2012) (Lisi, C.J.); *Kidder v. Richmond Area Health Center*, 595 F. Supp. 2d 139, 140 (D. Me. 2009) (removing "pursuant to 42 U.S.C. § 233(c), 28 U.S.C § 2679(d), 28 U.S.C. §§ 1441, 1442(a)(1) and 1446"); *see also Williams v.*

39

*Brantley*, 492 F. Supp. 925 (W.D.N.Y. 1980) (concluding managing attorney of county-based, federally-authorized and funded legal assistance corporation entitled to invoke § 1442(a)(1) as a federal officer)), *aff'd*, 738 F.2d 419 (2d Cir. 1984). Indeed, HHS, by regulation, expressly defines an "Employee of the Department" of HHS to include deemed PHS employees for purposes of information they acquire in the performance of medical, surgical, dental and related functions within the scope of their employment with a deemed health center grantee. 45 C.F.R. §§ 2.1(a), 2.2(4) (defining "Employee of the Department" to include "Employees and qualified contractors of an entity covered under the [FSHSCAA]" with respect to information acquired during the "performance of medical, surgical, dental or related functions which were performed by the entity, its employees and qualified contractors" at a time when they were "deemed" to be "covered by the FSHCAA"). This regulation characterizes the functions of a deemed PHS employee as "official duties" or duties undertaken in an "official capacity with DHHS." *Id.* § 2.1.

### 2.    Centerville Was Sued for or Related to Acts Under Color of Office

Plaintiff's action is for—or relating to—acts Centerville undertook under color of office. Centerville's alleged acts and omissions "derived solely from [its] official duties" *Willingham*, 395 U.S. at 408 ("In a civil suit . . . we think it was sufficient for petitioners to have shown that their relationship to respondent derived solely from their official duties."); *see also Maryland v. Soper*, (No. 1), 270 U.S. 9, 32–33 (1926)

40

(federal officer need not admit he committed charged offenses to secure removal). The Third Circuit takes a "permissive view" of this requirement, having held that, in light of the statute's 2011 revision, "to meet the 'for or relating to' requirement, 'it is sufficient for there to be a connection or association between the act in question and the federal office.'" *Papp*, 842 F.3d at 813 (quoting *Def. Ass'n*, 790 F.3d at 471 and noting 2011 revisions "broaden[ed] the universe of acts that enable Federal officers to remove [suits] to Federal court").

Centerville's alleged conduct occurred in the performance of its official duties. As explained *supra*, Plaintiff's complaint is grounded in activities Centerville undertook—or allegedly failed to undertake—to meet various of the "administratively burdensome" "Federal requirements" "address[ing] all areas of operation" imposed on Centerville as a condition of its health center grantee status. H.R. Rep. No. 102-823, at 5. Among them: Centerville's obligation to conduct outreach activities, continually assess the needs of its catchment area, and protect and maintain patient privacy. 42 U.S.C. § 254b(b)(1)(A)(iv), (k)(3)(C), (J). Nothing more is needed to satisfy § 1442(a)(1)'s "color of office" requirement. *See Willingham*, 395 U.S. at 409 ("[O]nce petitioners had shown that their only contact with respondent occurred inside the penitentiary, while they were performing their duties, we believe that they had demonstrated the required 'causal connection."); *accord Commonwealth of Pennsylvania v. Newcomer*, 618 F.2d 246, 249–50 (3d Cir. 1980) ("[I]n Willingham,

41

in the face of allegations of wrongs against a prison inmate, the prison warden was held to have satisfied this causal connection merely by the fact that he was on duty, at his place of employment, at all relevant times.").

### B. Centerville Was, At The Very Least, Acting Under a Federal Officer Within the Meaning of 28 U.S.C. § 1442

Centerville, a federally-funded health center operating in accordance with 42 U.S.C. § 254b and deemed to be a PHS employee under for purposes of official immunity, was, at the very least, acting under a federal officer. *See Friedenberg*, 68 F.4th at 1131–32; *Agyin*, 986 F.3d at 171, 185. The words "acting under" in § 1442(a)(1) are broad. *Symes*, 286 U. S. at 517; *accord Watson,* 551 U.S. at 147; *Agyin*, 986 F.3d at 175 ("[B]oth § 1442 and especially its 'acting under' provision must be read broadly."). The Third Circuit employs a four-part test to determine whether a removing defendant is entitled to invoke 28 U.S.C. § 1442(a)(1) as a "person acting under a federal officer": (1) the defendant must be a "person" within the meaning of the statute; (2) the plaintiff's claims must be based on the defendant "acting under" the United States, its agencies, or its officers; (3) the plaintiff's claims against the defendant must be "for or relating to" an act under color of federal office; and (4) the defendant must raise a colorable federal defense. *See Def. Ass'n*, 790 F.3d at 467, *as amended* (June 16, 2015). Each factor is met here.

Much of this test is easily resolved. Centerville is indisputably a "person" within the meaning of the officer removal statute. *See Def. Ass'n*, 790 F.3d at 467 ("Because

the statute does not define 'person,' [the court] look[s] to 1 U.S.C. § 1, which defines the term to 'include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.'"). Plaintiff's claims against Centerville—as explained *supra*—are for or relate to acts under color of Centerville's "office," *i.e.*, its fulfillment of its federally-supported health center project. *See Defender Ass'n*, 790 F.3d at 471; *accord Papp*, 842 F.3d at 813. And there should likewise be no doubt that Centerville—asserting its official immunity based on its deemed PHS employee status—raises a colorable federal defense. *See Mesa*, 489 U.S. at 136 ("[I]t is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes."); *Davis*, 100 U.S. at 262 (permitting federal officer removal as long as "a Federal question or a claim to a Federal right is raised in the case, and must be decided therein.").

The key question is thus whether Centerville was "acting under" the United States, its agencies, or its officers. A defendant's "'acting under' must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Def. Ass'n*, 790 F.3d at 468 (quoting *Watson*, 551 U.S. at 152). Although "compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official,'" *Watson*, 551 U.S. at 153, a private entity's "sufficiently close" relationship with the federal government

can provide the basis for "acting under" removal. *Defender Ass'n*, 790 F.3d at 469 (adopting "principles outlined in *Watson*" to guide "acting under" analysis); *accord Doe v. Redeemer Health*, No. CV 23-2405, 2023 WL 6323089, at *3 (E.D. Pa. Sept. 28, 2023) ("Even when a private corporation is not supplying a specific good or service to the federal government, it can still be deemed 'acting under' a federal officer or agency on the basis of a 'sufficiently close' relationship with that federal entity."); *see also Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 136–37 (2d Cir. 2008) (noting need for "special relationship" between person "acting under" and federal superior). In evaluating the relationship between a defendant's actions and the federal officer, the court "must credit the defendants' theory of the case." *Agyin*, at 175 (citing *Jefferson Cnty*, 527 U.S. at 432) (internal quotation marks omitted).

In *Def. Ass'n*, this Court concluded that the Federal Community Defender Organization for the Eastern District of Pennsylvania, a private, non-profit entity "created through the Criminal Justice Act" and "delegated the authority to provide representation" under that statute was acting under the Administrative Office of the United States Courts. *Def. Ass'n*, 790 F.3d at 469. In so determining, the Court found persuasive that by statute, the Federal Community Defender's "stated purposes must include implementation of the aims and purposes of the CJA." *Id*. The nonprofit was further required to "adopt bylaws consistent with representation under the CJA and a model code of conduct similar to those governing Federal Public Defender

44

Organizations." *Id.* Based on this underlying relationship with the federal government—as a nonprofit recipient of federal funding—and its purpose of implementing the CJA by providing counsel to federal defendants and indigent federal habeas corpus petitioners, this Court concluded the Federal Community Defender was assisting to "carry out [] the duties or tasks of a federal superior." *Id.* at 469; *see also Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1143 (11th Cir. 2017) (concluding non-profit utility cooperative acted under federal officer because such cooperatives "exist to provide a public function conceived of and directed by the federal government," *i.e.*, "bringing electricity to sparsely populated rural areas that would not otherwise receive electricity").

The relationship between Centerville and a federal official—namely the HHS Secretary, who has largely delegated authority to the Health Services and Resources Administration (HRSA) under 42 U.S.C. § 254b(o)—is sufficiently "special" and "close" to render Centerville "acting under" the United States. *Cf. In re Joliet-Will Cnty. Cmty. Action Agency*, 847 F.2d 430, 432 (7th Cir. 1988) ("nature of the grantor-grantee relationship is such as to constitute the grantee in effect an agent to carry out specified tasks"). The Second Circuit, explicitly embracing this Court's reasoning in *Def. Ass'n*, concluded that a deemed PHS physician was acting under a federal officer where, in fulfilling his duties as a health center employee, "[h]e assisted and helped to carry out the duties of the federal government to provide medical care to the indigent."

45

*Agyin*, 986 F.3d at 176 (citing H.R. Rep. No. 104-398, at 5 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 767, 769). Indeed, the federal government historically fulfilled this role directly, in part through Congress's establishment of the National Health Service Corps ("NHSC") and its concurrent grant of authority to the HHS Secretary to, under certain conditions, "assign commissioned officers and other personnel of the Service to provide . . . health care and services for persons residing in [an area designated by the Secretary as having a critical health manpower shortage]." *See* Pub. L. No. 91-623, 84 Stat. 1870–71, §§ 2(a), (b) (1970) ("It shall be the function of an identifiable administrative unit within the Service to improve the delivery of health services to persons living in communities or areas of the United States where health personnel and services are inadequate to meet the health needs of the residents of such communities and areas."). When considering the FSHCAA, Congress noted that, historically, more than one-half of health center staff were in the NHSC. H.R. Rep. No. 102-823(I), at 5 ("According to the National Association of Community Health Centers (NACHC), all NHSC assignees were members of the [PHS] until 1983, and thus were covered under the FTCA as Federal employees"); *see also* HRSA, NHSC, *NHSC Timeline*, https://nhsc.hrsa.gov/about-us/timeline (providing that, after 1983, "NHSC members are no longer federal employees.").[5]

---

[5] Part of Congress's motivation for FSHCAA was to address increased costs incurred during the 9-year period when the majority of health center staff *were not* PHS employees. *See* H.R. Rep. No. 102-823(I), at 5 (". . . the NHSC-assigned physicians

In concluding that a deemed PHS physician was acting under a federal officer while providing medical care, the Second Circuit in *Agyin* further noted that the physician's federally-supported community health center employer was "subject to detailed requirements and oversight by the federal government" that—more than mere regulation—amount to "direct and detailed control of a federal agency or officer." *Id.* (citing H.R. Rep. No. 102-823, at 5). The same "administratively burdensome" "Federal requirements" "address[ing] all areas of operation" applicable in *Agyin* apply to Centerville here. H.R. Rep. No. 102-823, at 5; *accord Agyin*, 986 F.3d at 176. The requirements go well beyond mere "regulation or compliance." *Maglioli v. All. HC Holdings LLC*, 16 F.4th 393, 405–06 (3d Cir. 2021) ("[S]omething "beyond regulation or compliance" is necessary to satisfy the requirement."); *see also Agyin*, 986 F.3d at 178 (noting indicia of "direct and detailed control of a federal agency or officer," over health centers, including through periodic "operational site visits . . . to verify compliance with the Health Center Program.")

The federal government dictates where Centerville can operate, who it must treat, the sort of treatment and services its personnel must provide, the manner in which it can charge for its services, how it must collect payment and from whom, how it must manage its finances and accounts, its relationships with contractors, and even the

---

lost their FTCA coverage, thus making malpractice costs a larger problem for the centers"). FSHCAA thus restored and extended the pre-existing FTCA protection by allowing health centers' employees to be deemed federal employees.

47

relationship it must maintain with other area providers. *See, e.g.*, 42 U.S.C. § 254b(b)(1) (enumerating required healthcare services), (b)(3)(authorizing HHS Secretary to designate geographic areas in which health centers may operate), (e)(5)(D) (mandating that all revenue generated by grant-supported activities be spent in furtherance of the grant project), (k)(2)(C) (authorizing HHS Secretary to require an assurance that the grantee provide "any health service . . . the Secretary finds is needed to meet specific health needs of the area to be served"), (k)(3)(B) (requiring centers to "make every reasonable effort to establish and maintain collaborative relationships with other health care providers"); (k)(3)(C) (requiring "ongoing quality improvement system . . . that maintains the confidentiality of patient records"); (k)(3)(D) (requiring centers demonstrate financial responsibility "by the use of such accounting procedures and other requirements as may be prescribed by the Secretary"); (k)(3)(E)–(F) (requiring centers to contract with federal payers); (k)(3)(G) (obligating centers to charge on an income-adjusted basis and treat all patients regardless of ability to pay); *see also* 42 C.F.R. §§ 51c.102(c)(1) (enumerating required healthcare services), 51c.403 (requiring provision of those "services enumerated in 51c.102(c)(1) . . . which the Secretary determines to be feasible and desirable); care for individuals who are unable to pay for services, 51c.303(u); implement income-based sliding fee and discount schedules and submit the same for agency approval, 51c.104(b)(9); describe key personnel in its requests for funds and justify the need for their positions to the

agency, 51c.104(b)(4) and 51c.303(f); create and submit an annual operating budget and three-year financial management plan to the agency, 51c.303(i); and seek prior approval from the agency for any changes to its budget or project plan "whenever there is to be a significant change in the scope or nature of project activities," 51c.107(c). Regarding governance, agency regulations not only mandate that health centers must establish and be overseen by a governing board, but also dictate the size and demographic composition of that board, as well as its purpose and function, down to how often it meets. § 51c.304(a)-(d). The agency, by regulation, further requires health centers to: abide by certain internal accounting requirements, 42 C.F.R. § 51c.112; implement specific internal quality assurance measures, § 51c.303(c); and hire independent auditors on an annual basis to conduct financial and programmatic audits, a requirement the Secretary may waive on a showing of good cause, § 51c.303(d). Simply put, there is little Centerville does that is not subject to a high degree of government direction and control.

The relationship is also one of collaboration—the governing statute requires the HHS Secretary to provide "technical" and other "nonfinancial assistance" to health center grantees to assist them in meeting program requirements. *Id.* § 254b(*l*) (requiring provision of, inter alia, "fiscal and program management assistance, training in fiscal and program management, [and] operational and administrative support"). Finally, the federal government encourages deemed PHS employees to mobilize their

personnel to support government efforts during public health emergencies. *See, e.g.*, Bureau of Primary Health Care, Determination of Coverage for COVID-19-Related Activity by Health Center Providers under 42 U.S.C. § 233(g)(1)(B) and (C), https://bphc.hrsa.gov/sites/default/files/bphc/ftca/pdf/COVID19GeneralDeterminatio n.pdf.

Centerville's daily activities are not only performed in accordance with strict federal requirements, they are paid for in part with federal funding disbursed to fulfill the "national objective" of providing "high quality health services to all American communities." S. Rep. No. 94-29, at 119 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 469, 581 (adding section 330 to the PHS Act, now codified at 42 U.S.C. § 254b *et seq.*, to provide federal assistance for community health centers); *see also* S. Rep. No. 107-83 at 2 (2001), as reprinted in 2001 U.S.C.C.A.N. 1033, 1034 (noting "critical" need for "committee to act to reauthorize and improve programs [including the Health Centers program] that make it possible for millions of Americans to access a health care safety net"). As in *Agyin*, the Court should credit Congress's recognition that "[t]he Federal government makes primary health care services available to medically underserved populations" in part by authorizing "the Department of Health and Human Services (HHS) [to] make[] grants to public or private nonprofit entities to provide primary health care services to specified underserved populations, regardless of their ability to pay." *Id.* (citing H.R. Rep. No.

104-398, at 5 (1995), *reprinted in* 1995 U.S.C.C.A.N. 767, 769). It is Centerville's receipt of this grant funding under 42 U.S.C. § 254b—*i.e.*, the basis of its special relationship with the federal government—that makes it baseline eligible for the immunity at issue. 42 U.S.C. § 233(g)(4).

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision below and remand this matter with instructions to substitute the United States in place of Centerville Clinics Inc.

FELDESMAN LEIFER LLP

*s/Matthew S. Freedus*
Matthew Sidney Freedus
Rosie Dawn Griffin
Khatereh S. Ghiladi
1129 20th Street, N.W., Suite 400
Washington, DC 20036
Tel: 202.466.8960

*Counsel for Appellant Centerville Clinics, Inc.*

## CERTIFICATE OF COMPLIANCE

1.  I hereby certify that this reply was prepared in Microsoft Word with 14-point Times New Roman, a proportionally spaced typeface. The brief contains a total of 12,429 words, as calculated by my word processing software, excluding the statements and other materials specified in Federal Rule of Appellate Procedure 32(f).

2.  In accordance with Third Circuit Local Appellate Rule 31.1(c), Appellant's Brief, as electronically filed on January 16, 2024, was scanned with a virus detection program, namely Trend Micro Security, and no virus was detected.

3.  In accordance with Third Circuit Local Appellate Rule 31.1(c), the text of Appellant's Brief, as electronically filed, is identical to the text of the Brief to be submitted in paper copy.

*s/Matthew S. Freedus*
Matthew S. Freedus

## CERTIFICATE OF BAR ADMISSION

Pursuant to Local Appellate Rule 28.3(d), I hereby certify that my name appears on the motion and I am a member of the bar of this Court. My co-counsel Rosie Dawn Griffin and Khatereh S. Ghiladi, whose names also appear on this motion, are likewise members of the bar of this Court.

*s/ Matthew S. Freedus*
Matthew S. Freedus

## CERTIFICATE OF SERVICE

It is hereby certified that a true and accurate copy of the foregoing brief was this 16th day of January 2024 filed using the CM/ECF system, which will electronically serve all counsel of record.

*s/ Matthew S. Freedus*
Matthew S. Freedus

**ADDENDUM**

# TABLE OF CONTENTS

28 U.S.C. § 1442 ........................................................................................... 1

28 U.S.C. § 1447 ........................................................................................... 3

42 U.S.C. § 233 ............................................................................................. 4

42 U.S.C. § 254b ......................................................................................... 16

# 28 U.S.C. § 1442

## § 1442. Federal officers or agencies sued or prosecuted

**Effective: January 2, 2013**

**(a)** A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

**(1)** The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

**(2)** A property holder whose title is derived from any such officer, where such action or prosecution affects the validity of any law of the United States.

**(3)** Any officer of the courts of the United States, for or relating to any act under color of office or in the performance of his duties;

**(4)** Any officer of either House of Congress, for or relating to any act in the discharge of his official duty under an order of such House.

**(b)** A personal action commenced in any State court by an alien against any citizen of a State who is, or at the time the alleged action accrued was, a civil officer of the United States and is a nonresident of such State, wherein jurisdiction is obtained by the State court by personal service of process, may be removed by the defendant to the district court of the United States for the district and division in which the defendant was served with process.

**(c)** Solely for purposes of determining the propriety of removal under subsection (a), a law enforcement officer, who is the defendant in a criminal prosecution, shall be deemed to have been acting under the color of his office if the officer--

**(1)** protected an individual in the presence of the officer from a crime of violence;

**(2)** provided immediate assistance to an individual who suffered, or who was threatened with, bodily harm; or

**(3)** prevented the escape of any individual who the officer reasonably believed to have committed, or was about to commit, in the presence of the officer, a crime of violence that resulted in, or was likely to result in, death or serious bodily injury.

**(d)** In this section, the following definitions apply:

**(1)** The terms "civil action" and "criminal prosecution" include any proceeding (whether or not ancillary to another proceeding) to the extent that in such proceeding a judicial order, including a subpoena for testimony or documents, is sought or issued. If removal is sought for a proceeding described in the previous sentence, and there is no other basis for removal, only that proceeding may be removed to the district court.

**(2)** The term "crime of violence" has the meaning given that term in section 16 of title 18.

**(3)** The term "law enforcement officer" means any employee described in subparagraph (A), (B), or (C) of section 8401(17) of title 5 and any special agent in the Diplomatic Security Service of the Department of State.

**(4)** The term "serious bodily injury" has the meaning given that term in section 1365 of title 18.

**(5)** The term "State" includes the District of Columbia, United States territories and insular possessions, and Indian country (as defined in section 1151 of title 18).

**(6)** The term "State court" includes the Superior Court of the District of Columbia, a court of a United States territory or insular possession, and a tribal court.

# 28 U.S.C. § 1447

## § 1447. Procedure after removal generally

**(A)** In any case removed from a State court, the district court may issue all necessary orders and process to bring before it all proper parties whether served by process issued by the State court or otherwise.

**(B)** It may require the removing party to file with its clerk copies of all records and proceedings in such State court or may cause the same to be brought before it by writ of certiorari issued to such State court.

**(C)** A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal. A certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case.

**(D)** An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise.

**(E)** If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court.

**42 U.S.C. § 233**

**§ 233. Civil actions or proceedings against commissioned officers or employees**
**Effective: September 30, 2022**

**(a) Exclusiveness of remedy**

The remedy against the United States provided by sections 1346(b) and 2672 of Title 28, or by alternative benefits provided by the United States where the availability of such benefits precludes a remedy under section 1346(b) of Title 28, for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee (or his estate) whose act or omission gave rise to the claim.

**(b) Attorney General to defend action or proceeding; delivery of process to designated official; furnishing of copies of pleading and process to United States attorney, Attorney General, and Secretary**

The Attorney General shall defend any civil action or proceeding brought in any court against any person referred to in subsection (a) of this section (or his estate) for any such damage or injury. Any such person against whom such civil action or proceeding is brought shall deliver within such time after date of service or knowledge of service as determined by the Attorney General, all process served upon him or an attested true copy thereof to his immediate superior or to whomever was designated by the Secretary to receive such papers and such person shall promptly furnish copies of the pleading and process therein to the United States attorney for the district embracing the place wherein the proceeding is brought, to the Attorney General, and to the Secretary.

**(c) Removal to United States district court; procedure; proceeding upon removal deemed a tort action against United States; hearing on motion to remand to determine availability of remedy against United States; remand to State court or dismissal**

Upon a certification by the Attorney General that the defendant was acting in the scope of his employment at the time of the incident out of which the suit arose, any such civil action or proceeding commenced in a State court shall be removed without bond at any time before trial by the Attorney General to the district court of the United States of the district and division embracing the place wherein it is pending and the proceeding deemed a tort action brought against the United States under the provisions of Title 28 and all references thereto. Should a United States district court determine on a hearing on a motion to remand held before a trial on the merit that the case so removed is one in which a remedy by suit within the meaning of subsection (a) of this section is not available against the United States, the case shall be remanded to the State Court: *Provided*, That where such a remedy is precluded because of the availability of a remedy through proceedings for compensation or other benefits from the United States as provided by any other law, the case shall be dismissed, but in the event the running of any limitation of time for commencing, or filing an application or claim in, such proceedings for compensation or other benefits shall be deemed to have been suspended during the pendency of the civil action or proceeding under this section.

## (d) Compromise or settlement of claim by Attorney General

The Attorney General may compromise or settle any claim asserted in such civil action or proceeding in the manner provided in section 2677 of Title 28 and with the same effect.

## (e) Assault or battery

For purposes of this section, the provisions of section 2680(h) of Title 28 shall not apply to assault or battery arising out of negligence in the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigations.

## (f) Authority of Secretary or designee to hold harmless or provide liability insurance for assigned or detailed employees

The Secretary or his designee may, to the extent that he deems appropriate, hold harmless or provide liability insurance for any officer or employee of the Public Health Service for damage for personal injury, including death, negligently caused by such officer or employee while acting within the scope of his office or employment and as a result of the performance of medical, surgical, dental, or

related functions, including the conduct of clinical studies or investigations, if such employee is assigned to a foreign country or detailed to a State or political subdivision thereof or to a non-profit institution, and if the circumstances are such as are likely to preclude the remedies of third persons against the United States described in section 2679(b) of Title 28, for such damage or injury.

**(g) Exclusivity of remedy against United States for entities deemed Public Health Service employees; coverage for services furnished to individuals other than center patients; application process; subrogation of medical malpractice claims; applicable period; entity and contractor defined**

**(1)(A)** For purposes of this section and subject to the approval by the Secretary of an application under subparagraph (D), an entity described in paragraph (4), and any officer, governing board member, or employee of such an entity, and any contractor of such an entity who is a physician or other licensed or certified health care practitioner (subject to paragraph (5)), shall be deemed to be an employee of the Public Health Service for a calendar year that begins during a fiscal year for which a transfer was made under subsection (k)(3) (subject to paragraph (3)). The remedy against the United States for an entity described in paragraph (4) and any officer, governing board member, employee, or contractor (subject to paragraph (5)) of such an entity who is deemed to be an employee of the Public Health Service pursuant to this paragraph shall be exclusive of any other civil action or proceeding to the same extent as the remedy against the United States is exclusive pursuant to subsection (a).

**(B)** The deeming of any entity or officer, governing board member, employee, or contractor of the entity to be an employee of the Public Health Service for purposes of this section shall apply with respect to services provided--

  **(i)** to all patients of the entity, and

  **(ii)** subject to subparagraph (C), to individuals who are not patients of the entity.

**(C)** Subparagraph (B)(ii) applies to services provided to individuals who are not patients of an entity if the Secretary determines, after reviewing an application submitted under subparagraph (D), that the provision of the services to such individuals--

**(i)** benefits patients of the entity and general populations that could be served by the entity through community-wide intervention efforts within the communities served by such entity;

**(ii)** facilitates the provision of services to patients of the entity; or

**(iii)** are otherwise required under an employment contract (or similar arrangement) between the entity and an officer, governing board member, employee, or contractor of the entity.

**(D)** The Secretary may not under subparagraph (A) deem an entity or an officer, governing board member, employee, or contractor of the entity to be an employee of the Public Health Service for purposes of this section, and may not apply such deeming to services described in subparagraph (B)(ii), unless the entity has submitted an application for such deeming to the Secretary in such form and such manner as the Secretary shall prescribe. The application shall contain detailed information, along with supporting documentation, to verify that the entity, and the officer, governing board member, employee, or contractor of the entity, as the case may be, meets the requirements of subparagraphs (B) and (C) of this paragraph and that the entity meets the requirements of paragraphs (1) through (4) of subsection (h).

**(E)** The Secretary shall make a determination of whether an entity or an officer, governing board member, employee, or contractor of the entity is deemed to be an employee of the Public Health Service for purposes of this section within 30 days after the receipt of an application under subparagraph (D). The determination of the Secretary that an entity or an officer, governing board member, employee, or contractor of the entity is deemed to be an employee of the Public Health Service for purposes of this section shall apply for the period specified by the Secretary under subparagraph (A).

**(F)** Once the Secretary makes a determination that an entity or an officer, governing board member, employee, or contractor of an entity is deemed to be an employee of the Public Health Service for purposes of this section, the determination shall be final and binding upon the Secretary and the Attorney General and other parties to any civil action or proceeding. Except as provided in subsection (i), the Secretary and the Attorney General may not determine that the provision of services which are the subject of such a determination are not covered under this section.

**(G)** In the case of an entity described in paragraph (4) that has not submitted an application under subparagraph (D):

**(i)** The Secretary may not consider the entity in making estimates under subsection (k)(1).

**(ii)** This section does not affect any authority of the entity to purchase medical malpractice liability insurance coverage with Federal funds provided to the entity under section 254b, 254b, or 256a[1] of this title.

**(H)** In the case of an entity described in paragraph (4) for which an application under subparagraph (D) is in effect, the entity may, through notifying the Secretary in writing, elect to terminate the applicability of this subsection to the entity. With respect to such election by the entity:

**(i)** The election is effective upon the expiration of the 30-day period beginning on the date on which the entity submits such notification.

**(ii)** Upon taking effect, the election terminates the applicability of this subsection to the entity and each officer, governing board member, employee, and contractor of the entity.
**(iii)** Upon the effective date for the election, clauses (i) and (ii) of subparagraph (G) apply to the entity to the same extent and in the same manner as such clauses apply to an entity that has not submitted an application under subparagraph (D).

**(iv)** If after making the election the entity submits an application under subparagraph (D), the election does not preclude the Secretary from approving the application (and thereby restoring the applicability of this subsection to the entity and each officer, governing board member, employee, and contractor of the entity, subject to the provisions of this subsection and the subsequent provisions of this section).

**(2)** If, with respect to an entity or person deemed to be an employee for purposes of paragraph (1), a cause of action is instituted against the United States pursuant to this section, any claim of the entity or person for benefits under an insurance policy with respect to medical malpractice relating to such cause of action shall be subrogated to the United States.

**(3)** This subsection shall apply with respect to a cause of action arising from an act or omission which occurs on or after January 1, 1993.

**(4)** An entity described in this paragraph is a public or non-profit private entity receiving Federal funds under section 254b of this title.

**(5)** For purposes of paragraph (1), an individual may be considered a contractor of an entity described in paragraph (4) only if--

**(A)** the individual normally performs on average at least 32 ½ hours of service per week for the entity for the period of the contract; or

**(B)** in the case of an individual who normally performs an average of less than 32 ½ hours of services per week for the entity for the period of the contract, the individual is a licensed or certified provider of services in the fields of family practice, general internal medicine, general pediatrics, or obstetrics and gynecology.

## (h) Qualifications for designation as Public Health Service employee

The Secretary may not approve an application under subsection (g)(1)(D) unless the Secretary determines that the entity--

**(1)** has implemented appropriate policies and procedures to reduce the risk of malpractice and the risk of lawsuits arising out of any health or health-related functions performed by the entity;

**(2)** has reviewed and verified the professional credentials, references, claims history, fitness, professional review organization findings, and license status of its physicians and other licensed or certified health care practitioners, and, where necessary, has obtained the permission from these individuals to gain access to this information;

**(3)** has no history of claims having been filed against the United States as a result of the application of this section to the entity or its officers, employees, or contractors as provided for under this section, or, if such a history exists, has fully cooperated with the Attorney General in defending against any such claims and either has taken, or will take, any necessary corrective steps to assure against such claims in the future; and

**(4)** will fully cooperate with the Attorney General in providing information relating to an estimate described under subsection (k).

**(i) Authority of Attorney General to exclude health care professionals from coverage**

**(1)** Notwithstanding subsection (g)(1), the Attorney General, in consultation with the Secretary, may on the record determine, after notice and opportunity for a full and fair hearing, that an individual physician or other licensed or certified health care practitioner who is an officer, employee, or contractor of an entity described in subsection (g)(4) shall not be deemed to be an employee of the Public Health Service for purposes of this section, if treating such individual as such an employee would expose the Government to an unreasonably high degree of risk of loss because such individual--

**(A)** does not comply with the policies and procedures that the entity has implemented pursuant to subsection (h)(1);

**(B)** has a history of claims filed against him or her as provided for under this section that is outside the norm for licensed or certified health care practitioners within the same specialty;

**(C)** refused to reasonably cooperate with the Attorney General in defending against any such claim;

**(D)** provided false information relevant to the individual's performance of his or her duties to the Secretary, the Attorney General, or an applicant for or recipient of funds under this chapter; or

**(E)** was the subject of disciplinary action taken by a State medical licensing authority or a State or national professional society.

**(2)** A final determination by the Attorney General under this subsection that an individual physician or other licensed or certified health care professional shall not be deemed to be an employee of the Public Health Service shall be effective upon receipt by the entity employing such individual of notice of such determination, and shall apply only to acts or omissions occurring after the date such notice is received.

**(j) Remedy for denial of hospital admitting privileges to certain health care providers**

In the case of a health care provider who is an officer, employee, or contractor of an entity described in subsection (g)(4), section 254h(e) of this title shall apply with respect to the provider to the same extent and in the same manner as such section applies to any member of the National Health Service Corps.

**(k) Estimate of annual claims by Attorney General; criteria; establishment of fund; transfer of funds to Treasury accounts**

**(1)(A)** For each fiscal year, the Attorney General, in consultation with the Secretary, shall estimate by the beginning of the year the amount of all claims which are expected to arise under this section (together with related fees and expenses of witnesses) for which payment is expected to be made in accordance with section 1346 and chapter 171 of Title 28 from the acts or omissions, during the calendar year that begins during that fiscal year, of entities described in subsection (g)(4) and of officers, employees, or contractors (subject to subsection (g)(5)) of such entities.

**(B)** The estimate under subparagraph (A) shall take into account--

**(i)** the value and frequency of all claims for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions by entities described in subsection (g)(4) or by officers, employees, or contractors (subject to subsection (g)(5)) of such entities who are deemed to be employees of the Public Health Service under subsection (g)(1) that, during the preceding 5-year period, are filed under this section or, with respect to years occurring before this subsection takes effect, are filed against persons other than the United States,

**(ii)** the amounts paid during that 5-year period on all claims described in clause (i), regardless of when such claims were filed, adjusted to reflect payments which would not be permitted under section 1346 and chapter 171 of Title 28, and

**(iii)** amounts in the fund established under paragraph (2) but unspent from prior fiscal years.

**(2)** Subject to appropriations, for each fiscal year, the Secretary shall establish a fund of an amount equal to the amount estimated under paragraph (1) that is attributable to entities receiving funds under each of the grant programs described in paragraph (4) of subsection (g), but not to exceed a total of $10,000,000 for each such fiscal year. Appropriations for purposes of this paragraph shall be made separate from appropriations made for purposes of sections 254b, 254b and 256a[1] of this title.

**(3)** In order for payments to be made for judgments against the United States (together with related fees and expenses of witnesses) pursuant to this section arising from the acts or omissions of entities described in subsection (g)(4) and of officers, governing board members, employees, or contractors (subject to subsection (g)(5)) of such entities, the total amount contained within the fund established by the Secretary under paragraph (2) for a fiscal year shall be transferred not later than the December 31 that occurs during the fiscal year to the appropriate accounts in the Treasury.

**(l) Timely response to filing of action or proceeding**

**(1)** If a civil action or proceeding is filed in a State court against any entity described in subsection (g)(4) or any officer, governing board member, employee, or any contractor of such an entity for damages described in subsection (a), the Attorney General, within 15 days after being notified of such filing, shall make an appearance in such court and advise such court as to whether the Secretary has determined under subsections (g) and (h), that such entity, officer, governing board member, employee, or contractor of the entity is deemed to be an employee of the Public Health Service for purposes of this section with respect to the actions or omissions that are the subject of such civil action or proceeding. Such advice shall be deemed to satisfy the provisions of subsection (c) that the Attorney General certify that an entity, officer, governing board member, employee, or contractor of the entity was acting within the scope of their employment or responsibility.

**(2)** If the Attorney General fails to appear in State court within the time period prescribed under paragraph (1), upon petition of any entity or officer, governing board member, employee, or contractor of the entity named, the civil action or proceeding shall be removed to the appropriate United States district court. The civil action or proceeding shall be stayed in such court until such court conducts a hearing, and makes a determination, as to the appropriate forum or procedure for

the assertion of the claim for damages described in subsection (a) and issues an order consistent with such determination.

**(m) Application of coverage to managed care plans**

**(1)** An entity or officer, governing board member, employee, or contractor of an entity described in subsection (g)(1) shall, for purposes of this section, be deemed to be an employee of the Public Health Service with respect to services provided to individuals who are enrollees of a managed care plan if the entity contracts with such managed care plan for the provision of services.

**(2)** Each managed care plan which enters into a contract with an entity described in subsection (g)(4) shall deem the entity and any officer, governing board member, employee, or contractor of the entity as meeting whatever malpractice coverage requirements such plan may require of contracting providers for a calendar year if such entity or officer, governing board member, employee, or contractor of the entity has been deemed to be an employee of the Public Health Service for purposes of this section for such calendar year. Any plan which is found by the Secretary on the record, after notice and an opportunity for a full and fair hearing, to have violated this subsection shall upon such finding cease, for a period to be determined by the Secretary, to receive and to be eligible to receive any Federal funds under titles XVIII or XIX of the Social Security Act.

**(3)** For purposes of this subsection, the term "managed care plan" shall mean health maintenance organizations and similar entities that contract at-risk with payors for the provision of health services or plan enrollees and which contract with providers (such as entities described in subsection (g)(4)) for the delivery of such services to plan enrollees.

**(n) Report on risk exposure of covered entities**

**(1)** Not later than one year after December 26, 1995, the Comptroller General of the United States shall submit to the Congress a report on the following:

**(A)** The medical malpractice liability claims experience of entities that have been deemed to be employees for purposes of this section.

**(B)** The risk exposure of such entities.

**(C)** The value of private sector risk-management services, and the value of risk-management services and procedures required as a condition of receiving a grant under section 254b, 254b, or 256a[1] of this title.

**(D)** A comparison of the costs and the benefits to taxpayers of maintaining medical malpractice liability coverage for such entities pursuant to this section, taking into account--

**(i)** a comparison of the costs of premiums paid by such entities for private medical malpractice liability insurance with the cost of coverage pursuant to this section; and

**(ii)** an analysis of whether the cost of premiums for private medical malpractice liability insurance coverage is consistent with the liability claims experience of such entities.

**(2)** The report under paragraph (1) shall include the following:

**(A)** A comparison of--

**(i)** an estimate of the aggregate amounts that such entities (together with the officers, governing board members, employees, and contractors of such entities who have been deemed to be employees for purposes of this section) would have directly or indirectly paid in premiums to obtain medical malpractice liability insurance coverage if this section were not in effect; with

**(ii)** the aggregate amounts by which the grants received by such entities under this chapter were reduced pursuant to subsection (k)(2).

**(B)** A comparison of--

**(i)** an estimate of the amount of privately offered such insurance that such entities (together with the officers, governing board members, employees, and contractors of such entities who have been deemed to be employees for purposes of this section) purchased during the three-year period beginning on January 1, 1993; with

**(ii)** an estimate of the amount of such insurance that such entities (together with the officers, governing board members, employees, and contractors of such

entities who have been deemed to be employees for purposes of this section) will purchase after December 26, 1995.

**(C)** An estimate of the medical malpractice liability loss history of such entities for the 10-year period preceding October 1, 1996, including but not limited to the following:

**(i)** Claims that have been paid and that are estimated to be paid, and legal expenses to handle such claims that have been paid and that are estimated to be paid, by the Federal Government pursuant to deeming entities as employees for purposes of this section.

**(ii)** Claims that have been paid and that are estimated to be paid, and legal expenses to handle such claims that have been paid and that are estimated to be paid, by private medical malpractice liability insurance.

**(D)** An analysis of whether the cost of premiums for private medical malpractice liability insurance coverage is consistent with the liability claims experience of entities that have been deemed as employees for purposes of this section.

**(3)** In preparing the report under paragraph (1), the Comptroller General of the United States shall consult with public and private entities with expertise on the matters with which the report is concerned.

* * *

**42 U.S.C. § 254b**

**§ 254b. Health centers (EXCERPTS)**

**(a)**  "Health center" defined

**(1)**  In general

For purposes of this section, the term "health center" means an entity that serves a population that is medically underserved, or a special medically underserved population comprised of migratory and seasonal agricultural workers, the homeless, and residents of public housing, by providing, either through the staff and supporting resources of the center or through contracts or cooperative arrangements—

**(A)**  required primary health services (as defined in subsection (b)(1)); and

**(B)**  as may be appropriate for particular centers, additional health services (as defined in subsection (b)(2)) necessary for the adequate support of the primary health services required under subparagraph (A);

for all residents of the area served by the center (hereafter referred to in this section as the "catchment area").

**(2)**  Limitation

The requirement in paragraph (1) to provide services for all residents within a catchment area shall not apply in the case of a health center receiving a grant only under subsection (g), (h), or (i).

**(b)**  Definitions

For purposes of this section:

**(1)**  Required primary health services

**(A)**  In general

The term "required primary health services" means—

  **(i)** basic health services which, for purposes of this section, shall consist of—

**(I)** health services related to family medicine, internal medicine, pediatrics, obstetrics, or gynecology that are furnished by physicians and where appropriate, physician assistants, nurse practitioners, and nurse midwives;

**(II)** diagnostic laboratory and radiologic services;

**(III)** preventive health services, including—

**(aa)** prenatal and perinatal services;

**(bb)** appropriate cancer screening;

**(cc)** well-child services;

**(dd)** immunizations against vaccine-preventable diseases;

**(ee)** screenings for elevated blood lead levels, communicable diseases, and cholesterol;

**(ff)** pediatric eye, ear, and dental screenings to determine the need for vision and hearing correction and dental care;

**(gg)** voluntary family planning services; and

**(hh)** preventive dental services;

**(IV)** emergency medical services; and

**(V)** pharmaceutical services as may be appropriate for particular centers;

**(ii)** referrals to providers of medical services (including specialty referral when medically indicated) and other health-related services (including substance use disorder and mental health services);

**(iii)** patient case management services (including counseling, referral, and follow-up services) and other services designed to assist health center patients in establishing eligibility for and gaining access to Federal, State, and local programs that provide or financially support the provision of medical, social, housing, educational, or other related services;

**(iv)** services that enable individuals to use the services of the health center (including outreach and transportation services and, if a substantial number of the individuals in the population served by a center are of limited

English- speaking ability, the services of appropriate personnel fluent in the language spoken by a predominant number of such individuals); and

**(v)** education of patients and the general population served by the health center regarding the availability and proper use of health services.

**(B)** Exception

With respect to a health center that receives a grant only under subsection (g), the Secretary, upon a showing of good cause, shall—

**(i)** waive the requirement that the center provide all required primary health services under this paragraph; and

**(ii)** approve, as appropriate, the provision of certain required primary health services only during certain periods of the year.

**(2)** Additional health services

The term "additional health services" means services that are not included as required primary health services and that are appropriate to meet the health needs of the population served by the health center involved. Such term may include—

**(A)** behavioral and mental health and substance use disorder services;

**(B)** recuperative care services;

**(C)** environmental health services, including—

**(i)** the detection and alleviation of unhealthful conditions associated with—

**(I)** water supply;

**(II)** chemical and pesticide exposures;

**(III)** air quality; or

**(IV)** exposure to lead;

**(ii)** sewage treatment;

**(iii)** solid waste disposal;

**(iv)** rodent and parasitic infestation;

**(v)** field sanitation;

**(vi)** housing; and

**(vii)** other environmental factors related to health; and

**(D)** in the case of health centers receiving grants under subsection (g), special occupation-related health services for migratory and seasonal agricultural workers, including—

**(i)** screening for and control of infectious diseases, including parasitic diseases; and

**(ii)** injury prevention programs, including prevention of exposure to unsafe levels of agricultural chemicals including pesticides.

**(3)** Medically underserved populations

**(A)** In general

The term "medically underserved population" means the population of an urban or rural area designated by the Secretary as an area with a shortage of personal health services or a population group designated by the Secretary as having a shortage of such services.

**(B)** Criteria

In carrying out subparagraph (A), the Secretary shall prescribe criteria for determining the specific shortages of personal health services of an area or population group. Such criteria shall—

**(i)** take into account comments received by the Secretary from the chief executive officer of a State and local officials in a State; and

**(ii)** include factors indicative of the health status of a population group or residents of an area, the ability of the residents of an area or of a population group to pay for health services and their accessibility to them, and the availability of health professionals to residents of an area or to a population group.

**(C)** Limitation

The Secretary may not designate a medically underserved population in a State or terminate the designation of such a population unless, prior to such designation or termination, the Secretary provides reasonable notice and opportunity for comment and consults with—

**(i)** the chief executive officer of such State;

**(ii)** local officials in such State; and

**(iii)** the organization, if any, which represents a majority of health centers in such State.

**(D)** Permissible designation

The Secretary may designate a medically underserved population that does not meet the criteria established under subparagraph (B) if the chief executive officer of the State in which such population is located and local officials of such State recommend the designation of such population based on unusual local conditions which are a barrier to access to or the availability of personal health services.

….

**(k)** Applications

**(1)** Submission

No grant may be made under this section unless an application therefore is submitted to, and approved by, the Secretary. Such an application shall be submitted in such form and manner and shall contain such information as the Secretary shall prescribe.

**(2)** Description of unmet need

An application for a grant under subparagraph (A) or (B) of subsection (e)(1) or subsection (e)(6) for a health center shall include—

**(A)** a description of the unmet need for health services in the catchment area of the center;

**(B)** a demonstration by the applicant that the area or the population group to be served by the applicant has a shortage of personal health services;

**(C)** a demonstration that the center will be located so that it will provide services to the greatest number of individuals residing in the catchment area or included in such population group; and

**(D)** in the case of an application for a grant pursuant to subsection (e)(6), a demonstration that the applicant has consulted with appropriate State and local government agencies, and health care providers regarding the need for the health services to be provided at the proposed delivery site.

Such a demonstration shall be made on the basis of the criteria prescribed by the Secretary under subsection (b)(3) or on any other criteria which the Secretary may prescribe to determine if the area or population group to be served by the applicant has a shortage of personal health services. In considering an application for a grant under subparagraph (A) or (B) of subsection (e)(1), the Secretary may require as a condition to the approval of such application an assurance that the applicant will provide any health service defined under paragraphs (1) and (2) of subsection (b) that the Secretary finds is needed to meet specific health needs of the area to be served by the applicant. Such a finding shall be made in writing and a copy shall be provided to the applicant.

**(3)** Requirements

Except as provided in subsection (e)(1)(B) or subsection (e)(6), the Secretary may not approve an application for a grant under subparagraph (A) or (B) of subsection (e)(1) unless the Secretary determines that the entity for which the application is submitted is a health center (within the meaning of subsection (a)) and that—

**(A)** the required primary health services of the center will be available and accessible in the catchment area of the center promptly, as appropriate, and in a manner which assures continuity;

**(B)** the center has made and will continue to make every reasonable effort to establish and maintain collaborative relationships with other health care providers, including other health care providers that provide care within the catchment area, local hospitals, and specialty providers in the catchment area of the center, to provide access to services not available through the health center and to reduce the non-urgent use of hospital emergency departments;

**(C)** the center will have an ongoing quality improvement system that includes clinical services and management, and that maintains the confidentiality of patient records;

**(D)** the center will demonstrate its financial responsibility by the use of such accounting procedures and other requirements as may be prescribed by the Secretary;

**(E)** the center—

  **(i)**

**(I)** has or will have a contractual or other arrangement with the agency of the State, in which it provides services, which administers or supervises the administration of a State plan approved under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.] for the payment of all or a part of the center's costs in providing health services to persons who are eligible for medical assistance under such a State plan; and

**(II)** has or will have a contractual or other arrangement with the State agency administering the program under title XXI of such Act (42 U.S.C. 1397aa et seq.) with respect to individuals who are State children's health insurance program beneficiaries; or

**(ii)** has made or will make every reasonable effort to enter into arrangements described in subclauses (I) and (II) of clause (i);

**(F)** the center has made or will make and will continue to make every reasonable effort to collect appropriate reimbursement for its costs in providing health services to persons who are entitled to insurance benefits under title XVIII of the Social Security Act [42 U.S.C. 1395 et seq.], to medical assistance under a State plan approved under title XIX of such Act [42 U.S.C. 1396 et seq.], or to assistance for medical expenses under any other public assistance program or private health insurance program;

**(G)** the center—

  **(i)** has prepared a schedule of fees or payments for the provision of its services consistent with locally prevailing rates or charges and designed to cover its reasonable costs of operation and has prepared a corresponding schedule of discounts to be applied to the payment of such fees or payments, which discounts are adjusted on the basis of the patient's ability to pay;

**(ii)** has made and will continue to make every reasonable effort—

**(I)** to secure from patients payment for services in accordance with such schedules; and

**(II)** to collect reimbursement for health services to persons described in subparagraph (F) on the basis of the full amount of fees and payments for such services without application of any discount;

**(iii)**

**(I)** will assure that no patient will be denied health care services due to an individual's inability to pay for such services; and

**(II)** will assure that any fees or payments required by the center for such services will be reduced or waived to enable the center to fulfill the assurance described in subclause (I); and

   **(iv)** has submitted to the Secretary such reports as the Secretary may require to determine compliance with this subparagraph;

**(H)** the center has established a governing board which except in the case of an entity operated by an Indian tribe or tribal or Indian organization under the Indian Self-Determination Act [25 U.S.C. 5321 et seq.] or an urban Indian organization under the Indian Health Care Improvement Act (25 U.S.C. 1651 et seq.)—

   **(i)** is composed of individuals, a majority of whom are being served by the center and who, as a group, represent the individuals being served by the center;

   **(ii)** meets at least once a month, selects the services to be provided by the center, schedules the hours during which such services will be provided, approves the center's annual budget, approves the selection of a director for the center who shall be directly employed by the center, and, except in the case of a governing board of a public center (as defined in the second sentence of this paragraph), establishes general policies for the center; and

   **(iii)** in the case of an application for a second or subsequent grant for a public center, has approved the application or if the governing body has not approved the application, the failure of the governing body to approve the application was unreasonable; except that, upon a showing of good cause the

Secretary shall waive, for the length of the project period, all or part of the requirements of this subparagraph in the case of a health center that receives a grant pursuant to subsection (g), (h), (i), or (p);

**(I)**   the center has developed—

**(i)**   an overall plan and budget that meets the requirements of the Secretary; and

**(ii)** an effective procedure for compiling and reporting to the Secretary such statistics and other information as the Secretary may require relating to—

**(I)**   the costs of its operations;

**(II)**   the patterns of use of its services;

**(III)** the availability, accessibility, and acceptability of its services; and

**(IV)** such other matters relating to operations of the applicant as the Secretary may require;

**(J)**   the center will review periodically its catchment area to—

**(i)**   ensure that the size of such area is such that the services to be provided through the center (including any satellite) are available and accessible to the residents of the area promptly and as appropriate;

**(ii)** ensure that the boundaries of such area conform, to the extent practicable, to relevant boundaries of political subdivisions, school districts, and Federal and State health and social service programs; and

**(iii)** ensure that the boundaries of such area eliminate, to the extent possible, barriers to access to the services of the center, including barriers resulting from the area's physical characteristics, its residential patterns, its economic and social grouping, and available transportation;

**(K)** in the case of a center which serves a population including a substantial proportion of individuals of limited English-speaking ability, the center has—

**(i)**   developed a plan and made arrangements responsive to the needs of such population for providing services to the extent practicable in the language and cultural context most appropriate to such individuals; and

(ii) identified an individual on its staff who is fluent in both that language and in English and whose responsibilities shall include providing guidance to such individuals and to appropriate staff members with respect to cultural sensitivities and bridging linguistic and cultural differences;

(L) the center, has developed an ongoing referral relationship with one or more hospitals;

(M) the center encourages persons receiving or seeking health services from the center to participate in any public or private (including employer-offered) health programs or plans for which the persons are eligible, so long as the center, in complying with this subparagraph, does not violate the requirements of subparagraph (G)(iii)(I); and

(N) the center has written policies and procedures in place to ensure the appropriate use of Federal funds in compliance with applicable Federal statutes, regulations, and the terms and conditions of the Federal award.

For purposes of subparagraph (H), the term "public center" means a health center funded (or to be funded) through a grant under this section to a public agency.